[No. 26918. *En Banc.* March 31, 1938.]

OPPORTUNITY TOWNSHIP, *Respondent,* v. H. L. KINGS-LAND, *as County Assessor of Spokane County, Appellant.*[1]

[1]Reported in 77 P. (2d) 793.

230

*Ralph E. Foley* and *A. O. Colburn,* for appellant.

*T. T. Grant* and *Fred J. Cunningham,* for respondent.

*Alfred J. Schweppe, Winlock Miller, Jr., B. Gray Warner, Wm. Hickman Moore,* and *Lloyd W. Shorett, amici curiae.*

GERAGHTY, J.—In this action, the plaintiff, Opportunity township, in Spokane county, sought a declaratory judgment passing upon the validity of chapter 81, Laws of 1937, p. 337, Rem. Rev. Stat. (Sup.), §§ 11376-1, 11443-1. Spokane county and its commissioners and assessor were made parties defendant. The plaintiff prayed that the court declare the rights and duties of the parties and determine the law to be unconstitutional. A demurrer interposed by the defendants to the complaint was overruled, and, the defendants de-

clining to plead further, a decree was entered adjudging chapter 81 to be unconstitutional and, therefore, of no force or effect. The defendant assessor appeals.

At its 1895 session, the legislature, pursuant to the provisions of § 4 of Art. 11 of the constitution, to which a more detailed reference will hereafter be made, enacted chapter 175 of that session, p. 472, authorizing the adoption of the township system of government by a majority vote of the electors in the respective counties. The act provides in detail for the manner in which the business of the townships is to be conducted, the officers to be elected or appointed, the powers to be exercised, and taxes levied and collected for township purposes. Chapter 175, as subsequently amended in some of its details, is found in Remington's Revised Statutes as §§ 11360 to 11484 [P. C. §§ 7100-1 to 7100-119], inclusive.

In passing, it may be stated that, of the thirty-nine counties of the state, only two, Spokane and Whatcom, have, at the present time, by vote of their electors, the township form of government. In 1908, the electors of Spokane county voted to adopt the township form, and, by appropriate proceedings under the statute, the territorial area of the county outside of its cities and towns was divided into townships by the county commissioners.

In order to understand the extent, if any, to which the challenged act impinges upon the functions of townships as organized under the enabling act, it is necessary to make reference in some detail to the provisions of the latter act. Each township is declared to be a body corporate with capacity: (1) To sue and be sued; (2) to purchase, or receive by gift or otherwise, and hold lands within its own limits and for the use of its inhabitants, subject to the power of the legislature; (3) to make contracts, purchase, and hold such

personal property as may be necessary for the exercise of its corporate or administrative powers, and convey and dispose of the same; and (4) to make such orders for the disposition, regulation or use of its corporate property as may be deemed conducive to the interest of its own inhabitants. Rem. Rev. Stat., § 11370 [P. C. § 7100-11].

The legislative power of the township is to be exercised at annual town meetings of the electors, to be held in January. The powers which may be exercised by the electors at their town meetings are enumerated in Rem. Rev. Stat., § 11378 [P. C. § 7100-18], and include authority to make such by-laws and regulations as may be conducive to the peace, good order, and welfare of the town, and, to that end, to license, tax, regulate, and control certain occupations. They are authorized to raise such sums of money for the repairs and construction of roads and bridges as they may deem necessary, and, also, to vote such sums of money for other necessary town charges as may be deemed expedient.

With respect to taxation, it is provided in Rem. Rev. Stat., § 11441 [P. C. § 7100-79], that each township assessor elected or appointed under the act shall, in his town,

". . . perform the same duties and exercise the same rights as are now performed and exercised by county assessors in their respective counties . . . and shall be subject to the same penalties as county assessors now are. . . ."

The township assessors are required to meet at the office of the county assessor on the second Tuesday of February of each year to

". . . formulate and adopt by a majority vote of those present a plan and policy for the purpose of securing the equitable and uniform listing and valuation of property throughout the county, and it shall be the

duty of all township assessors to make their respective assessments according to the plan and policy adopted at such meeting, and the county assessor shall have supervisory control over said township assessors for the purpose of enforcing the making of assessments according to such plan and policy." Rem. Rev. Stat., § 11441.

Provision is made (Rem. Rev. Stat., § 11443 [P. C. § 7100-81]) for a meeting of the board of township supervisors on the second Monday in May to review the assessment of property returned by the township assessor. At this hearing, all complaints and grievances of individuals, residents of the town or district, in reference to the assessment of any property, are to be heard and decided by the town board, with a proviso that complaints of nonresidents are to be heard and determined by the county board of equalization.

Rem. Rev. Stat., § 11442 [P. C. § 7100-80], provides that the county assessor shall, in making up his roll for the county board of equalization, add thereto the assessment rolls of the various townships. These rolls are to be equalized by the county board of equalization, *as between townships,* as other property in such counties is equalized. Where it becomes necessary to raise the assessment of a township, the board of equalization is required to serve written notice upon the chairman of the township board of supervisors of its intention so to do, and also give notice by publication to residents of the townships.

It is provided by Rem. Rev. Stat., § 11445 [P. C. § 7100-83]:

" . . . The taxes voted by townships. . . . shall be certified by the proper authorities to the county auditor on or before the first day of November, in each year. . . ."

The town charges for which taxes may be levied are enumerated as: (1) The compensation of town

officers for services rendered their respective towns; (2) contingent expenses necessarily incurred for the use and benefit of the town; (3) the moneys authorized to be raised by the vote of the town meeting for any town purpose; (4) every sum directed by law to be raised for any town purpose: Provided, that no tax for town purposes shall exceed the amount voted to be raised at the annual town meeting, as provided by law. Rem. Rev. Stat., § 11446 [P. C. § 7100-85].

The moneys necessary to defray the town charges of each town are to be levied on the taxable property in the township in the manner prescribed in the title for raising revenue and other money for state and county purposes and expenses. Rem. Rev. Stat., § 11447 [P. C. § 7100-86].

All taxes levied for township purposes

". . . shall be payable to and shall be collected by the county treasurer of the county in which such township is situated, and such taxes shall be extended on the county tax-rolls, in columns to be provided for that purpose and properly headed, and shall be payable and shall become delinquent at the same time as county taxes are; . . ." Rem. Rev. Stat., § 11454 [P. C. § 7100-92].

Chapter 81, Laws of 1937, p. 337, is as follows:

"An Act relating to taxation; providing that no township assessor shall be elected hereafter and that the town board of review shall not hereafter meet or convene, or perform any duties or exercise any power, and abolishing the office of township assessor and the town board of review, in connection therewith, and vesting the powers and duties of said assessor and said board in the county assessor and county board of equalization respectively; and declaring that this act shall take effect immediately.

"*Be it enacted by the Legislature of the State of Washington:*

"Section 1. Hereafter no assessor shall be elected by the electors of any township at any township meet-

ing; nor shall the board of supervisors of any township hereafter meet and convene, or exercise any powers or perform any duties, as a town board of review, for the purpose of reviewing the assessment of property of the township or for any other purpose.

"Sec. 2. On and after March 1, 1937, the office of township assessor and the town board of review for townships shall be and hereby are abolished; and on and after said date all powers and duties of said assessors and said board of review shall be vested in and required to be performed by the county assessor and the county board of equalization, respectively: *Provided,* That the abolishment of said office and said board shall not affect the validity of any act done or performed by any township assessor or any town board of review in assessing and valuing or equalizing property for taxation purposes prior to said date, and shall not affect the validity of any tax levied or based upon any such acts.

"Sec. 3. This act is necessary for the immediate support of the state government and its existing public institutions and shall take effect immediately."

It will thus be seen that the challenged act affects the integrity of the township organization and restricts its functions only in so far as it provides for the listing and valuation of township property by the county assessor and board of equalization. The township retains the power to vote taxes for all authorized purposes, to be levied and collected substantially as provided in the act governing township organization.

The trial court was of the opinion that, in respect of the function conferred upon the county assessor and board of equalization, the 1937 act violated § 12 of Art. 11 and § 9 of Art. 7 of the state constitution. It also expressed the opinion that the act was violative of § 19 of Art. 2 of the state constitution, with respect to its title, and § 37 of the same article, in that it seeks to amend an existing law by reference merely without setting out at length the portion of the act amended.

■ We shall refer first to the constitutional objections urged against the substance of the act. Article 11 of the state constitution deals with county, city, and township organization. Section 1 of the article specifically recognizes as legal subdivisions of the state the several counties of Washington territory existing at the time of the adoption of the constitution. Section 4 of the article, important in its relation to the present controversy, and pursuant to which the enabling act for townships was passed, follows:

"The legislature shall establish a system of county government, which shall be uniform throughout the state, and by general laws shall provide for township organization, under which any county may organize whenever a majority of the qualified electors of such county voting at a general election shall so determine; and whenever a county shall adopt township organization the assessment and collection of the revenue shall be made, and the business of such county and the local affairs of the several townships therein, shall be managed and transacted in the manner prescribed by such general law."

Section 5 of the same article provides that the legislature, by general and uniform laws, shall provide for

" . . . the election in the several counties of boards of county commissioners, sheriffs, county clerks, treasurers, prosecuting attorneys, *and other county, township, or precinct and district officers,* as public convenience may require, *and shall prescribe their duties* and fix their term of office." (Italics ours.)

These sections, considered by themselves, would seem to leave no room for doubt as to the legislative control over the township organization, both in respect of its functions and as to the officers who are to exercise them. This view is expressed in *Gunther v. Huneke,* 58 Wash. 494, 108 Pac. 1078, where the court, in construing § 4 of Art. 11, in connection with § 11 of the same article, which confers upon counties, cities, towns,

or townships authority to make and enforce police, sanitary, and other regulations not in conflict with general laws, said:

"These provisions make it plain that townships as well as counties, cities, and towns are subject to general law, and the management of the business thereof is subject to control by the legislature, which is of necessity supreme, and which may alter or amend at will by general law, either directly or by implication, any general or local law or regulation."

It is to be noted that § 4 of Art. 11 recognizes the county as the primary organ of local government and requires the legislature to establish a system of county government. The township organization, which had not theretofore existed under the territorial government, is left optional with the counties. The inhabitants of a given district are not empowered to organize themselves into a township. The electors of the county determine whether the township organization shall be adopted, and, upon their affirmative vote, the county commissioners establish the territorial boundaries of the townships.

It may be said that, as the township is a territorial subdivision of the county, so its governmental organization, brought into being at the will of the electors of the county, is, in a sense, an integral part of the plan for county government in the counties voting to adopt it. All the functions of the townships might be exercised by the counties themselves without the aid of township organization, as, indeed, all but two of the counties of the state now do.

It is urged that the principle of local self-government is violated by the challenged statute. In this country, that principle is fundamental in our conception of free government; but the extent to which authority must be devolved upon local governmental entities is not expressed in any general formula, and

we must look to the constitution itself for the answer. If the framers of the constitution had considered the existence of townships essential to the free government they were establishing, they would have made the system mandatory rather than optional.

It is contended that the inclusive language of § 4 of Art. 11 is limited by § 12 of the same article and § 9 of Art. 7 of the constitution. These sections follow:

"The legislature shall have no power to impose taxes upon counties, cities, towns, or other municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may by general laws vest in the corporate authorities thereof the power to assess and collect taxes for such purposes." Art. 11, § 12.

". . . For all corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes, and such taxes shall be uniform in respect to persons and property within the jurisdiction of the body levying the same." Art. 7, § 9.

By the first clause of § 12, the legislature is forbidden to impose taxes upon municipal subdivisions of the state for local purposes, but the challenged act does not attempt to impose taxes on the township. The township itself is to determine the amount of taxes to be imposed and collected. The last clause of § 12, as well as § 9 of Art. 7, authorizes the legislature, by general laws, to vest in the corporate authorities "the power to assess and collect taxes" for their corporate purposes.

It is contended that the power to assess embraces, as an essential element, the listing and valuation of the township property, and that this must be done by the township authorities. Now, if it is required that the assessment, in the sense contended for, must be done by the township officers, it would seem to be equally mandatory, under the language employed, that the col-

lection of the taxes, even though the function be ministerial, be done by the township officers. If these sections are mandatory as to one function, they are equally so as to the other. Under the township enabling act, which the respondent is seeking to maintain in its entirety, the collection of the township taxes is made by the county treasurer, and this method of collecting, so far as we are advised, has never been challenged by the townships.

This is not a new type of legislation in the history of the state. In 1893, the legislature enacted chapter 71, p. 167, entitled:

"AN ACT providing for the assessment and collection of taxes of cities of the first class and specifying the duties of certain county officers in regard thereto, and declaring an emergency."

This act, in substance, provided for the levy of their taxes by cities of the first class upon the equalized roll of real and personal property within their limits prepared by the county assessor and equalized by the county and state boards of equalization. The act also made the county treasurer of each county in which there was a city of the first class *ex-officio* collector of city taxes. The act provided that it should

". . . supersede all conflicting provisions of law or charters of cities of the first class relating to the assessment, equalization and collection of general taxes for municipal purposes, and no such city board of equalization shall exercise any jurisdiction for the equalization of property for general city taxes: . . ." Laws of 1893, chapter 71, p. 170, § 9.

Provision was made for payment of five hundred dollars annually to the county treasurer for the duties to be performed by him in the collection of city taxes, this to be in addition to a salary otherwise provided for by law. Each city was also required to pay the county in which it was situated one thousand dollars

per annum for clerk hire. Prior to the enactment of this law, the city of Seattle had adopted a freeholders' charter, as authorized by § 10 of Art. 11 of the constitution. This charter embodied provisions for the levy and collection by the city of its own taxes for municipal purposes.

James M. Carson, the city comptroller of Seattle, was, under its charter, *ex-officio* city assessor. The city charter required him to prepare a roll of the real and personal property within the city taxable for city purposes, with the value thereof, and provided that, in the assessment and listing of property for taxation, he should have the same powers as were conferred by law upon the county assessor.

After passage of the legislative act, Carson, in obedience to its provisions, declined to prepare the assessment roll, or further perform the functions of city assessor. The city of Seattle then applied to the superior court for a writ of mandamus requiring him to proceed to prepare the assessment roll as required in the charter. In his return to the alternative writ, Carson pleaded the legislative act. He also demurred to the alternative writ. The demurrer was sustained and a peremptory writ denied. On appeal to this court, the judgment of the superior court was affirmed. *State ex rel. Seattle v. Carson,* 6 Wash. 250, 33 Pac. 428.

There, as here, objection was made to the law on the ground that it violated the provisions of § 9 of Art. 7 and § 12 of Art. 11 of the constitution. Passing upon this contention, the court said:

"The respondent contends that the argument of appellant rests upon an incorrect interpretation of the words 'to assess and collect taxes' used in the provisions of the constitution of Washington. And he argues that as the power of taxation is a legislative power, and as all legislative power is by the constitution vested in the legislature, were it not for the said provisions of the

constitution the legislature could tax municipal corporations for corporate purposes. That the right which is denied to the legislature is the power *to impose taxes* upon municipal corporations for corporate purposes. The power denied to the legislature is the power it is permitted to vest in the corporate authorities. The use of the word 'but' after the denial of the power of the legislature requires this construction. That the expression 'to assess and collect taxes' must then mean 'to impose and collect taxes,' and that this construction is indirectly sustained by the Illinois authorities. So long, therefore, as the tax is imposed by the corporate authorities, the evil sought to be avoided by the constitutional provisions is not incurred. Respondent contends that the expression 'to assess' does not mean the making of an assessment in the sense of a valuation. The word assess has two meanings—(1) To charge; (2) to value. And if we substitute in the constitution the meaning of the expression for the expression itself, we have in the one case, sense, and the other, nonsense, thus:

· "1. 'The legislature shall have no power to impose taxes upon . . . municipal corporations for . . . municipal purposes, but may, by general laws, vest in the corporate authorities the power to *charge* and collect taxes for such purposes.'

"2. 'The legislature shall have no power to impose taxes upon . . . municipal corporations for municipal purposes, but may, by general laws, vest in the corporate authorities the power *to value* and collect taxes.'

"That the power to value taxes would be meaningless, but the power to charge taxes is perfectly clear. The argument advanced by the respondent strikes us as sound, and we agree with him that it is the power to collect taxes which must be vested in the corporate authorities. And as the act makes it the *duty* of the treasurer to collect the tax levied, by so doing it vests in the corporate authorities of the city the power to collect by giving it the machinery for the collection. It by no means follows that because the corporate authorities are to be vested with the power to collect the tax, that therefore they must themselves be the ma-

chinery for its collection. The act of collection and the power to compel the act are not identical."

While the opinion in this case has been criticised in some quarters, the conclusion reached by the court has been accepted and followed to such an extent that all the cities of the state, of every class, with the exception of one city operating under a territorial charter, have levied their assessments for municipal purposes upon the rolls made by the county assessor, and this is equally true with respect to other types of municipal corporations, such as port, metropolitan park, and utility districts.

In view of this uniform practice from the early days of statehood, to uphold respondent's position would be revolutionary in its consequences. Such a holding would require the election or appointment of assessors in all the municipal subdivisions of the state, and the separate listing and valuation of all the properties within their borders for taxation purposes.

The act of 1937 affects the respondent, Opportunity township, precisely as the act of the 1893 session affects the city of Spokane, which, since its passage, has levied its taxes upon the valuation fixed by the county assessor, without any suggestion that it was thereby deprived of the right to self-government.

The respondent relies on the case of *State ex rel. State Tax Commission v. Redd,* 166 Wash. 132, 6 P. (2d) 619. In that case, the tax commission, on its own motion, and after the original taxing process had been completed and appeals taken to the court, undertook summarily to reassess individual properties, acting under the authority of chapter 106, Laws of 1931, p. 306 (Rem. Rev. Stat., § 11301 [P. C. § 6882-197] *et seq.*). The court held that, in so far as chapter 106 attempted to confer upon the tax commission the power sought to be exercised, the act was unconstitutional as in

violation of § 9 of Art. 7 and § 12 of Art. 11 of the constitution. The conclusion of the court is stated in the following paragraphs:

"Manifestly, the legislature not possessing such power [to impose taxes upon local muncipal corporations for local purposes], the state tax commission (an agency created by the legislature) can not legally assess property within the limits of a county for county purposes. It follows that the state tax commission is likewise without authority to reassess such property for the same purpose.

"If the local authorities only, as we hold, have the power to list and value property within the county for local taxation purposes, no other authorities can legally relist and revalue that property for local taxation purposes. . . .

"In so far as it provides that the state tax commission may reassess for local taxation purposes property within a county, city, town, or other municipal corporation, chapter 106, Laws of 1931, is unconstitutional."

While the *Redd* case held that the state could not, within the limits of a county, make an assessment, in the sense of listing and valuation, for local purposes, it did not hold, and could not have held consistently with the practice that had existed for so long a period under authority of our decisions, that a listing and valuation, or assessment, made by the county assessor could not be the basis for a valid levy by cities, townships, and other municipal corporations within the county.

We next direct our attention to the objections urged against the title and form of the act.

The title is an unusually complete index to the body of the act. If it is subject to criticism, it is on the score of its prolixity rather than its paucity of words. The respondent objects specially to the initial phrase,

"An act relating to taxation," contending that this is misleading, since the act does not relate to taxation generally, but exclusively to township taxation. But that phrase could have left no doubt in the minds of the legislators as to the purpose sought to be accomplished or the content of the act, in view of the detailed recital that followed.

■ It is next objected that the act violates § 37 of Art. 2, which provides that no act shall ever be revised or amended by mere reference to its title, but that the act revised or the section amended shall be set forth at length.

Chapter 81 does not refer to the township act by title or otherwise, but substantively vests certain public officers with specified functions theretofore performed by other officers. This is a method of legislation frequently followed in the course of our legislative history. The purpose of the constitutional provision is stated by Judge Cooley in *People v. Mahaney*, 13 Mich. 481:

"This constitutional provision must receive a reasonable construction, with a view to give it effect. The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws. An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to but not republished, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision, and cannot be held to be prohibited by it without violating its plain intent."

In *Spokane Grain & Fuel Co. v. Lyttaker,* 59 Wash. 76, 109 Pac. 316, where a similar question arose, the court, speaking through Judge Rudkin, after an extensive review of the authorities, said:

"It seems to us the foregoing authorities demonstrate that the act in question is not violative of the constitutional provision under consideration. Nearly every legislative act of a general nature changes or modifies some existing statute, either directly or by implication, and as said by the court in *Ex parte Pollard, supra* [40 Ala. 77], 'Whether an amendatory or an original act should be employed is a matter of legislative judgment and discretion which the courts cannot control.' The purpose of the constitutional provision was to protect the members of the legislature and the public against fraud and deception; not to trammel or hamper the legislature in the enactment of laws. If the act in question were entitled an act to amend the lien laws of the state, by proper reference, its validity could not be called in question, yet, what additional information would such a title or such an act bring home to either the legislature or the public. True, such an amendment would direct attention to the existing laws on the subject, but such was not the object or purpose of the framers of the constitution. So long as a legislative act is complete in itself, and has a sufficient title, it satisfies the requirements of the constitution, whether it contains much or little. The legislature may embody all legislation relating to a given subject in a single act, or it may cover the subject by a succession of acts. This is entirely a matter of legislative discretion over which we can assume no control."

Our conclusion is that the challenged act, in substance and form, is constitutional. The judgment of the trial court is reversed, and the cause remanded with direction to dismiss.

STEINERT, C. J., HOLCOMB, BEALS, ROBINSON, SIMPSON, and MILLARD, JJ., concur.

MAIN, J. (concurring except in one particular)—I concur in the majority opinion in this case except in one particular, and that is, the attempted distinction of the case of *State ex rel. State Tax Commission v. Redd,* 166 Wash. 132, 6 P. (2d) 619. As I view it, that case is out of harmony with the majority opinion in this case, and also is out of harmony with the case of *State ex rel. Seattle v. Carson,* 6 Wash. 250, 33 Pac. 528. It is my view that the *Redd* case should be modified so that it would harmonize with this case and the *Carson* case.

I concur in the majority opinion except in the one particular mentioned.

BLAKE, J., concurs with MAIN, J.

