[No. 44770. En Banc. March 29, 1979.]

WEYERHAEUSER COMPANY, *Respondent,* v.
KING COUNTY, *Appellant.*

722

*Christopher T. Bayley, Prosecuting Attorney,* and *John E. Keegan* and *Richard W. Elliott, Deputies,* for appellant.

*Jan S. Pauw* and *Shidler, McBroom, Gates & Baldwin,* by *C. V. Wentz,* for respondent.

HOROWITZ, J.—The question here concerns the power of a local government to regulate forest practices within its shorelines under the Shoreline Management Act of 1971. RCW 90.58. Appellant King County placed three water quality control conditions in contest here on a substantial development permit issued to Weyerhaeuser Company for construction of a logging road and bridge within the shorelines of Calligan Lake. The conditions were modified and upheld by the Shorelines Hearings Board. Respondent appealed to the Superior Court for Thurston County, which struck the conditions on the ground the County was deprived of authority to impose such conditions on forest practices by a 1975 amendment to the Forest Practices Act of 1974. In the appeal before this court we called for supplemental briefs on the question of the validity of that enactment under article 2, section 37 of the state constitution. Having carefully considered all arguments presented by the parties in their briefs and in oral argument, we conclude the 1975 amendment in question violated the constitutional requirements for amending an existing statute, and is void. We therefore reverse the order of the Superior Court and reinstate the order of the Shorelines Hearings Board.

Calligan Lake is a 361–acre mountain lake in King County lying in the Cascade Mountain Range. Its inlet at the eastern end is Calligan Creek, which also forms the outlet at the western end of the lake. The lake itself, a portion of the Creek at the inlet, and the entire length of the creek as outlet, are protected shorelines under the Shoreline Management Act of 1971 (SMA).

The waters of Calligan Lake are of a very high quality, supporting a natural trout fishery, and offering a possible future source of municipal water for the City of Bellevue. The steep slopes of the surrounding drainage basin are densely wooded with commercially valuable species of timber. Respondent Weyerhaeuser is the major landowner in the lake basin and owns all of the shorelines and associated wetlands on the lake and creek.

Respondent has conducted timber harvesting and related forest management activities in the Calligan Lake basin since 1950. It plans to continue harvesting so as to remove all merchantable timber by 1990, while carrying on related programs such as reforestation and fertilization. A necessary component of these activities is the construction of roads and landings.

In 1972 respondent built a bridge over Calligan Creek, and 1,300 feet of logging road which crossed the shoreline as it is defined by the SMA. The following year the road was lengthened by 3,200 feet. Most of the road lies within the shoreline. Respondent did not apply to the County for a substantial development permit prior to building the road and bridge. The County, contending such a permit was required under the SMA, brought suit in the Superior Court for King County for a declaratory judgment, injunction, damages, and other relief. The parties agreed to a stipulation and order requiring respondent to apply for a permit, but reserving to respondent the right to litigate the issue whether a permit was required and to challenge whatever action the County took on the application.

In June 1974 the County issued a substantial development permit, retroactively authorizing construction of the bridge and logging road. The permit was subject to nine conditions, three of which are in issue here. Conditions 7, 8 and 9 impose specific water quality control requirements on respondent's construction and use of the road and bridge. Condition 7 requires that the road and bridge, as well as logging practices in the lake basin which involve use of the road and bridge, not degrade the water quality of the lake

and creek below certain standards. Condition 8 requires a baseline study of water quality which was to be commenced immediately. Condition 9 requires continued monitoring of the water during the entire period of time respondent carries out logging operations in the basin. The baseline and monitoring studies are to be carried out in a manner specified by the Department of Ecology, and in cooperation with that agency. The water quality control program outlined in these conditions is clearly designed to prevent any degradation of the waters of the lake and creek.

Respondent appealed these conditions to the Shorelines Hearings Board, which also considered the question whether the bridge and road were a substantial development requiring a permit under the provisions of the SMA. Following a full evidentiary hearing the Board entered detailed findings of fact and conclusions of law. The Board concluded the road and bridge together were one project subject to the permit requirements of the SMA. It further concluded the road alone constituted a substantial development which required a permit pursuant to the act. With regard to the water quality control conditions, the Board concluded the County has authority under the SMA to regulate water quality as a condition incidentally and reasonably related to a shoreline management permit. It limited the conditions in two ways, however. The Board held the monitoring program should be terminated by the Department of Ecology when it has determined that respondent's activity on the road and bridge will not degrade the quality of the water. It also concluded that the conditions are applicable only to the road and bridge, and not to logging practices outside the shoreline which utilize the road and bridge. The substantial development permit, with conditions thus modified, was upheld by an order dated March 10, 1975.

Respondent then petitioned the Superior Court for Thurston County for review of the Board's action pursuant to RCW 90.58.180(3). The County cross-appealed the Board's order prohibiting application of the water quality

conditions to logging practices outside the shoreline. Prior to the court's determination of the case, but after the Board issued its order, the legislature enacted certain amendments to the Forest Practices Act of 1974 (FPA). Laws of 1975, 1st Ex. Sess., ch. 200. The Superior Court concluded these amendments prohibit imposition of water quality control conditions on forest practices through a shoreline substantial development permit, and struck the conditions from the permit. The court, however, upheld the Board's determination that the road and bridge were a substantial development requiring such a permit.

The County now appeals from the court's order striking the conditions. Respondent cross–appeals its conclusion that the road construction required a substantial development permit. Since the question whether a permit can be required logically precedes any consideration of conditions attached to such a permit, we consider respondent's cross appeal first.

I

Under the Shoreline Management Act of 1971, no "substantial development" may be undertaken within a shoreline without a permit from the governmental entity having administrative authority over that shoreline. RCW 90.58-.140(2). The term "substantial development" is defined in RCW 90.58.030(3)(e) with reference to the definition of "development" in subsection (3)(d). A "development" is a use consisting of, inter alia, "dumping" and "filling." The Board concluded in this case that the road construction involved both "dumping" of gravel and "filling" by side-casting soil cut from the steep slopes of the basin. The construction thus was a "development" which met the additional requirement necessary to constitute a "substantial development," and a permit was required.

■■ Respondent contends the Board erred as a matter of law in concluding the road construction involved "dumping" and "filling," and that no permit can be

required for the road. We do not agree that this is a question of law. There can be little dispute as to the meaning of the statutory terms "dumping" and "filling." The question is thus whether the facts of this case fall within the statutory terms. We have characterized such an issue as a question of fact. *Leschi Improvement Council v. State Highway Comm'n,* 84 Wn.2d 271, 283, 525 P.2d 774 (1974). In reviewing the Board's determination of this question of fact, then, we will accord appropriate deference to its specialized knowledge and expertise. *English Bay Enterprises, Ltd. v. Island County,* 89 Wn.2d 16, 21, 568 P.2d 783 (1977); *Hama Hama Co. v. Shorelines Hearings Bd.,* 85 Wn.2d 441, 448, 536 P.2d 157 (1975).

Construction of the logging road here involved hauling in and dumping truckloads of gravel for surfacing. In some places it was necessary to cut into steep slopes and cast the loosened soil over the downhill side. At one point dynamite was used to blast out rock. The Board concluded the in-hauling and spreading of gravel constituted "dumping" and the side-casting of soil constituted "filling." We are mindful that the Board is required by the statute to construe its terms liberally in order to give full effect to legislative objectives. RCW 90.58.900. Road construction is the major cause of soil erosion from forest practices. Department of Ecology shorelines management regulations in fact contemplate close regulation of road construction. WAC 173–16–060(3)(c), (d). Under these circumstances, the Board's determination fully supported the policy of the SMA to protect against degradation of the State's shorelines. Its conclusion that the road met the requirements of a "development" is neither arbitrary and capricious nor clearly erroneous. There is no contention the road did not meet the additional requirement to constitute a "substantial" development. We thus affirm the Board's conclusion that construction of the logging road was a substantial development requiring a permit under the SMA.

## II

The remaining issues concern the validity of the conditions attached to the substantial development permit. The threshold question is whether the 1975 amendments to the Forest Practices Act of 1974 apply because, as discussed below, those amendments would have a significant effect on the scope of the County's authority under the SMA. As stated above, we find the amendment in question here to be unconstitutional and void. Following our discussion of the reasons for which we find it so, we turn to the remaining issues regarding the proper use and scope of water quality conditions in a shorelines substantial development permit.

A. Validity of Laws of 1975, 1st Ex. Sess., ch. 200, § 11.

In 1975 the legislature amended the FPA by Substitute House Bill No. 1078, enacted as Laws of 1975, 1st Ex. Sess., ch. 200. Section 11 of the bill amends RCW 76.09.240, a section of the FPA which limits the authority of local governments over forest practices. Prior to the 1975 enactment, subsection (4) of RCW 76.09.240 expressly reserved to local government all authority granted by the SMA. The amendments, however, add several paragraphs to subsection (4)[1]

---

[1]Laws of 1975, 1st Ex. Sess., ch. 200:

"Sec. 11. Section 24, chapter 137, Laws of 1974 ex. sess. and RCW 76.09.240 are each amended to read as follows:

"No county, city, municipality, or other local or regional governmental entity shall adopt or enforce any law, ordinance, or regulation pertaining to forest practices, except that to the extent otherwise permitted by law, such entities may exercise any:

" . . .

"(4) Authority granted by chapter 90.58 RCW, the 'Shoreline Management Act of 1971', except that in relation to "shorelines" as defined in RCW 90.58.030, the following shall apply:

"(a) The forest practice regulations adopted pursuant to this chapter shall be the sole rules applicable to the performance of forest practices, and enforcement thereof shall be solely as provided in chapter 76.09 RCW;

"(b) As to that road construction which constitutes a substantial development, no permit shall be required under chapter 90.58 RCW for the construction of up to five hundred feet of one and only one road or segment of a road provided such road does not enter the shoreline more than once. Such exemption from said permit requirements shall be limited to a single road or road segment for each forest

which effectively deprive local governments of the power to regulate forest practices in the shoreline.

Although the County maintains this amendment can be read to be consistent with the grant of authority in the SMA, we cannot agree. The SMA requires each local government to develop a master program for the use and development of shorelines within its boundaries. RCW 90.58.080. The programs, once approved by the Department of Ecology, operate as controlling use regulations for the various shorelines of the state. RCW 90.58.100. Local governments are required by RCW 90.58.140 to establish a program for the administration and enforcement of a permit system regulating substantial developments within the shorelines. They are also given authority under RCW 90.58.210 to bring court actions to enforce the provisions of the SMA and prevent unauthorized use of the shorelines. The authority granted to local governments by these provisions is very broad. No exception is made for the conduct of forest practices within the shorelines.

The amendment to the FPA in question here, however, prohibits imposition of any regulations other than Department of Natural Resources regulations, on forest practices in the shoreline, thus contravening the intent of the SMA that shorelines master programs control. It also prohibits enforcement of regulations by any procedure other than

practice and such road construction shall be subject to the requirements of chapter 76.09 RCW and regulations adopted pursuant thereto and to the prohibitions or restrictions of any master program in effect under the provisions of chapter 90.58 RCW. Nothing in this subsection shall add to or diminish the authority of the shoreline management act regarding road construction except as specifically provided herein. The provisions of this subsection shall not relate to any road which crosses over or through a stream, lake, or other water body subject to chapter 90.58 RCW;

"(c) Nothing in this section shall create, add to, or diminish the authority of local government to prohibit or restrict forest practices within the shorelines through master programs adopted and approved pursuant to chapter 90.58 RCW except as provided in (a) and (b) above.

"Any powers granted by chapter 90.58 RCW pertaining to forest practices, as amended herein, are expressly limited to lands located within 'shorelines of the state' as defined in RCW 90.58.030."

730 of

those set out in the FPA, depriving local government of the power to enforce SMA rules under RCW 90.58.210. Subsection (4)(b) of the amended statute expressly applies these limits to most road construction. Subsection (c) reserves to local government only that SMA authority relating to determining the *types* of forest practices which may take place in the shoreline, depriving it of power to regulate the *manner* in which the practices take place. The amendment, in short, deprives local governments of almost all, but not all of the regulatory authority over forest practices they had originally been granted in the SMA.

■ We do not dispute the legislature's power to enact such a restriction on the authority it granted in the SMA. In this case, however, it has not done so in a manner consistent with the requirements of the state constitution. Article 2, section 37 of the Washington State Constitution requires that any act revising or amending another act must set forth the revised or amended section in full. Substitute House Bill No. 1078 amended the SMA, but did not set out those provisions of the SMA which were affected. The result was to substantially alter the scope and effect of the SMA without changing the language of the statute to reflect that alteration. Section 11 of the bill failed to meet the constitutional requirements for properly amending the SMA, and is therefore void.[2]

■ A review of the cases which have construed article 2, section 37 compels this conclusion. In *State ex rel. Arnold v. Mitchell*, 55 Wash. 513, 518, 104 P. 791 (1909) this court held that an act which alters the scope and effect of a statute "is clearly amendatory of that section," and must comply with Const. art. 2, § 37. The constitution is violated, the court held, if an act refers to a prior statute, which is changed but not repealed, "so that the full declaration of the legislative will on the subject can only be ascertained by reading both statutes". *State ex rel. Arnold v. Mitchell,*

---

[2]We need not reach appellant's further contention that the statute violates article 2, section 19 of the state's constitution.

*supra* at 518. One purpose of this requirement is to avoid the confusion and uncertainty created by having separate but related provisions scattered throughout legislative volumes. *State ex rel. Washington Toll Bridge Authority v. Yelle*, 54 Wn.2d 545, 342 P.2d 588 (1959). The second purpose is to ensure that legislators are aware of the nature of the law being amended and the effect the particular amendment will have. *Flanders v. Morris*, 88 Wn.2d 183, 558 P.2d 769 (1977).

The determination whether an act is an amendment does not depend on whether it purports on its face to be amendatory. *Gruen v. State Tax Comm'n*, 35 Wn.2d 1, 24, 211 P.2d 651 (1949). The test to be applied, as stated above, is whether it changes a prior act in scope and effect. We note, however, that section 11 of House Bill No. 1078 does expressly purport to amend not only the FPA but the SMA as well, as appears in the final paragraph of subsection (4). Moreover, the fact that the scope and effect of the SMA are altered is not even in dispute. Indeed, respondent enumerates in its supplemental memorandum to this court the specific sections of the SMA which are altered in their effect by the amendment. Respondent further acknowledges that the chief characteristic of an improperly amended statute is present here. It concedes in its supplemental memorandum that "persons reading only the SMA admittedly could arrive at an erroneous interpretation of its applicability to forest practices." It is not disputed, then, that the act suffers from the vice noted in *Flanders v. Morris, supra* at 189, that the language of the statute affected (here the SMA) does not reflect the intended change in its effect. Readers of the SMA cannot know from the language of that statute that its broad grant of authority over activities in the shorelines is severely restricted, as to forest practices only, by an unidentified provision of the FPA. This is precisely the weakness sought to be avoided by the constitutional requirement that an amended statute be set out in full in the amending act.

We cannot agree with respondent that section 11 of Substitute House Bill No. 1078 falls into one of the categories of exceptions to the requirements of article 2, section 37. An act qualifying as an exception must be a complete act, independent of prior acts and standing alone as the law on the particular subject which it treats. *Naccarato v. Sullivan,* 46 Wn.2d 67, 278 P.2d 641 (1955). In such a case, of course, the potential for uncertainty and confusion regarding the act's meaning and effect is greatly reduced. The enactment in question here, however, cannot be understood without reference to both the FPA and the SMA. It is therefore not a complete act and is not excepted from application of the constitutional requirement.

█ Nor do we agree with respondent that the act is a preemption under the FPA of SMA authority over some forest practices, rather than an amendment to the SMA. One agency may preempt a field of regulation, to the exclusion of another agency which had previously acted in the same capacity, when the two agencies would otherwise have precisely the same function and purpose. *See Simpson Timber Co. v. Olympic Air Pollution Control Authority,* 87 Wn.2d 35, 549 P.2d 5 (1976). *See also Bethlehem Steel Co. v. New York State Labor Relations Bd.,* 330 U.S. 767, 775–76, 91 L. Ed. 1234, 67 S. Ct. 1026 (1947). Such is not the case here however. Local governments acting under the SMA do not have the same function and purpose as the Department of Natural Resources enforcing its own regulations under the FPA. These two entities act with very different purposes, and with limited jurisdictions over the manner in which forest practices are conducted. Local governments have authority under the SMA to enforce Department of Ecology regulations, and otherwise regulate activities within the shorelines, for the purpose of protecting the quality of state shorelines. *See* RCW 90.58.020. The Department of Natural Resources acting under the FPA, on the other hand, enforces its regulations regarding forest practices for the purpose of protecting public, private and

commercial forest lands. *See* RCW 76.09.010. The Department of Natural Resources does not have specific regulatory authority over shorelines activities aimed at protecting state waters; local governments have no direct SMA jurisdiction over many logging practices outside designated shorelines. The situation thus resembles that in *Edmonds School Dist. 15 v. Mountlake Terrace,* 77 Wn.2d 609, 465 P.2d 177 (1970), in which this court held a school district, charged with responsibility for providing education, is obliged to comply with local municipal building codes, even though the district has independent statutory authority to erect and maintain school buildings. The state created district did not preempt the field of building standards. *Edmonds School Dist. 15 v. Mountlake Terrace, supra* at 614. The circumstances of this case likewise do not suggest that SMA authority to protect state shorelines has been preempted by the FPA. The FPA has a different purpose altogether.

The amendments to the FPA cannot then be said to preempt the field of regulation of forest practices in the shoreline. The proper interpretation of this amendment, we are convinced, is that it amends the SMA by altering the scope and effect of local government authority over forest practices in the shoreline.

Having concluded the 1975 amendment to the FPA in question here violates the state constitution and is thus inapplicable to the County's exercise of authority under the SMA, we turn to the remaining questions regarding the validity and application of water quality control conditions attached to the substantial development permit.

B. Validity of the water quality control conditions.

The Shorelines Hearings Board concluded the water quality control conditions imposed by the County are reasonably related to regulation of the road and bridge, and could be applied to those activities. The Board based its conclusion on the fact that erosion from road construction is a major threat to water quality, and in this case the road

even intersects the path of surface waters flowing into the lake and stream. Recognizing that the SMA was not primarily designed to regulate water quality, the Board nonetheless concluded that water quality is a vital consideration in land use planning under the SMA and that "[c]onditions of a permit relating to water quality are in furtherance of one of the many policies of the Act, namely, the protection of water quality."

Respondent concedes that, in the absence of the FPA amendment which we have found unconstitutional, local governments have authority to regulate forest practices in the shoreline through master programs and substantial development permits. It contends, however, that the water quality standards imposed here, standards promulgated by the Department of Ecology in water quality regulations, are not suitable for enforcement. It also contends that direct enforcement of water quality standards against forest practices is prohibited by RCW 90.48.240, a section of the water pollution control act (WPCA).

▮ The Department of Ecology has sole responsibility for establishing state water quality standards under the provisions of the WPCA. RCW 90.48.420(1). The same statutory section requires that forest practice regulations promulgated by both the Department of Ecology and the forest practices board achieve compliance with water pollution control law. Both the WPCA and the water quality regulations promulgated thereunder clearly contemplate that Department water quality standards will be enforced. *See* WAC 173–201–090 ACHIEVEMENT CONSIDERATIONS; WAC 173–201–120 ENFORCEMENT. The standards imposed under the permit conditions here in fact include very specific criteria. WAC 173–201–030. We conclude the standards imposed in the permit conditions are set forth with sufficient specificity and are well suited, and intended, for enforcement.

We also conclude that RCW 90.48.420(3) does not bar enforcement of water quality controls through a substantial

development permit. That provision of the WPCA prohibits the imposition of any permit system for nonpoint pollution caused by forest practices under the procedures of that act. It also prohibits imposition of civil or criminal penalties under the act on any forest practice which complies with certain applicable statutes and regulations. These provisions, however, are simply not relevant to the question here, that is, the authority of the County under the SMA to impose water quality control conditions in a shoreline management substantial development permit. We are not faced with an attempt to establish a permit system for nonpoint pollution under the procedures of the WPCA, or with imposition of penalties under that act.

We conclude that the County has authority under the SMA to impose water quality control conditions on forest practices which are regulated by substantial development permits. We affirm the Shorelines Hearings Board conclusion in this regard, including the provision in its order that the monitoring program be terminated by the Department of Ecology when it has ascertained with reasonable certainty that respondent's activity has not and will not degrade the water quality of the lake. We note the County has raised no objection to this modification of the conditions.

C. Application of conditions to logging practices outside the shoreline.

The remaining issue involves a determination of the scope of authority granted by the SMA. In the original permit the water quality condition prohibiting degradation of the waters of Calligan Lake and Creek applied to logging practices in the basin as well as the road and bridge. The Shorelines Hearings Board struck from the condition the phrase applying it to logging practices outside the shoreline. The Board reasoned that certain forest practices such as replanting, fertilization and thinning are not subject to regulation by means of permits because they are not

"developments" within the meaning of the SMA. It concluded these practices cannot then be regulated indirectly by including them in conditions attached to a permit regulating activities for which a permit is required. The Board thus limited application of the water quality control conditions to the construction and use of the bridge and road.

■ We recognize that logging practices on lands adjacent to a shoreline may be regulated by means of the master program. *See* RCW 90.58.100(2). Furthermore, the intended use of adjacent lands should be considered when taking any action under the SMA in order to achieve the coordinated development of the shorelines which is the object of the SMA. *See Merkel v. Port of Brownsville*, 8 Wn. App. 844, 509 P.2d 390 (1973). Direct authority to regulate uses of lands adjacent to shorelines is limited in the SMA, however, to the function of land use planning. Only those developments within the shorelines are subject to regulation by permits. The Board's determination that logging practices outside the shoreline cannot be regulated by means of substantial development permits for developments within the shoreline accords, then, with the structure and language of the statute.

■ The Board's interpretation of the act, while not controlling, is accorded considerable weight by this court. In construing the SMA the Board draws on its special knowledge and experience as the entity charged with administering and enforcing the statute. Where, as here, the Board's interpretation is consistent with the language of the act, and clearly serves to further its goals, we find it appropriate to affirm the Board's action.

The judgment of the Superior Court below is reversed, and the order of the Shorelines Hearings Board is reinstated. It is so ordered.

UTTER, C.J., ROSELLINI and WRIGHT, JJ., and COCHRAN, J. Pro Tem., concur.

DOLLIVER, J. (dissenting)—Except to those persons familiar with the legislation being considered, the journals of the House and Senate rarely reveal the political struggle or the balancing of interests which accompanies the enactment of most major legislation. A review of the pages of the House and Senate Journals for 1974 and 1975, however, indicates clearly the scope, intensity, and public nature of the contest attendant to the passage of the Forest Practices Act of 1974 (FPA), Laws of 1974, 1st Ex. Sess., ch. 137, p. 401, and the 1975 amendment, Laws of 1975, 1st Ex. Sess., ch. 200, p. 665. A number of policy questions were to be determined by that branch of government to which the constitution gives basic policy–making powers, the legislature. Involved were timber interests, both large and small, environmentalists, the Department of Natural Resources, the Department of Ecology, local governments, individual legislators, and numerous other interested citizens. As is the case with most controversial legislation, some parties did not get what they wanted. In the instance of the 1975 amendments to the FPA, King County lost its power to regulate forest practices within the "shorelines". Having lost the political struggle in the legislature, the county now attempts to win the legal battle by claiming the 1975 amendment violates Const. art. 2, § 37.

Const. art. 2, § 37 states:

No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length.

In an early and comprehensive analysis of this provision, the court said:

The purpose of the constitutional provision was to protect the members of the legislature and the public against fraud and deception; not to trammel or hamper the legislature in the enactment of laws. . . . So long as a legislative act is complete in itself, and has a sufficient title, it satisfies the requirements of the constitution, whether it contains much or little. The legislature may embody all legislation relating to a given subject in a single act, or it may cover the subject by a succession of acts. This is

entirely a matter of legislative discretion over which we can assume no control.

*Spokane Grain & Fuel Co. v. Lyttaker,* 59 Wash. 76, 82, 109 P. 316 (1910).

In *Naccarato v. Sullivan,* 46 Wn.2d 67, 75, 278 P.2d 641 (1955), the court stated the instances where article 2, section 37, is not violated:

> (1) complete acts which repeal prior acts or sections thereof on the same subject; (2) complete acts which adopt by reference provisions of prior acts; (3) complete acts which supplement prior acts or sections thereof without repealing them; (4) complete acts which incidentally or impliedly amend prior acts.

*See also* 1A Sutherland, *Statutory Construction,* Amendatory Acts, ch. 22, at 104–208 (Sands 4th ed. 1972).

To see if Laws of 1975, 1st Ex. Sess., ch. 200, p. 665, meets any of the exemptions, it is first necessary to determine if it is a complete act. Initially, the majority errs by confining only to section 11 of that chapter its consideration as to whether article 2, section 37 is violated. Obviously a mere section of an act is not complete, but it is to chapter 200 in its entirety that we must apply the constitutional test. Chapter 200 is a complete act. I find it hard to believe that either the majority or King County could find otherwise. *See Gruen v. State Tax Comm'n,* 35 Wn.2d 1, 24, 211 P.2d 651 (1949).

The majority goes on to assert that "The enactment in question here, however, cannot be understood without reference to both the FPA and the SMA [Shoreline Management Act of 1971, RCW 90.58]. It is therefore not a complete act and is not excepted from application of the constitutional requirement." This simply misconstrues the constitutional requirement and overlooks the consistent position of this court beginning with the leading case on the subject, *Spokane Grain & Fuel Co. v. Lyttaker, supra.* In commenting on a case which had done exactly what the majority proposes, the court said:

But how often must we look to two or more acts to ascertain the full declaration of the legislative will. No one will for a moment doubt the power of the legislature to exempt homesteads by one act, household goods by another, farming implements by a third, and so on; yet the full declaration of the legislative will on the subject of exemptions could only be gathered by referring to these several acts. Followed to its logical conclusion, this argument would compel the legislature to embody in a single enactment, or in amendments thereto, all legislation relating to a single subject. Such was not the object or purpose of the provision in question. So long as a legislative act is complete in itself and does not tend to mislead or deceive, it is not violative of the constitution.

*Spokane Grain & Fuel Co.,* at 84.

Not only is this a complete act in itself, but it meets the purpose of the amendment as declared by this court: to protect the legislature and the public from fraud and deception. *Spokane Grain & Fuel Co.,* at 82.

No person of ordinary intelligence can mistake its meaning. We know full well what the legislature *intended,* without referring to any other act or statute.

(Italics mine.) *Spokane Grain & Fuel Co.,* at 84. It should not go without notice that at no time has there been a claim of fraud or deception violative of article 2, section 37. In fact, article 2, section 37 was not cited in the briefs of the parties but was raised sua sponte by this court and was discussed only in supplemental briefs filed subsequent to oral argument.

If Laws of 1975, 1st Ex. Sess., ch. 200, p. 665, is a complete act, does it come under an exemption? It seems to me it clearly is both a complete act which incidentally or impliedly amends a prior act, and a complete act which repeals a section of an act on the same subject.

Prior to the 1975 amendments to the FPA, local governments under the Shoreline Management Act of 1971 (SMA) had certain powers to regulate forest practices in the shorelines of the state. *See* Laws of 1974, 1st Ex. Sess., ch. 137, § 24(4), p. 420. After the passage of chapter 200 in 1975, certain of these regulative powers were removed from local

governments. Those sections of the SMA granting these powers to local governments to regulate forest practices within the shorelines of the state were repealed and the functions of local governments given to the forest practices board.

In addition to the general rules announced in *Naccarato v. Sullivan, supra,* we have specifically upheld legislation which substantially vests certain public officers with specified functions theretofore performed by other officers. *Opportunity Township v. Kingsland,* 194 Wash. 229, 244, 77 P.2d 793 (1938). In *Carstens v. DeSellem,* 82 Wash. 643, 647, 144 P. 934 (1914), referring to an article 2, section 37, challenge, we said, "It is true that the act imposes certain duties upon the commissioner which by other statutes are imposed upon other officers. But we do not think this fact renders the act obnoxious to the provision of the constitution under review." *See also* 1A Sutherland, *Statutory Construction* § 22.21 (Sands 4th ed. 1972); Annot., 67 A.L.R. 564, 569 (1930); *Yelle v. Bishop,* 55 Wn.2d 286, 298, 347 P.2d 1081 (1959); *Mahler v. Tremper,* 40 Wn.2d 405, 412, 243 P.2d 627 (1952); *Bellingham v. Hite,* 37 Wn.2d 652, 225 P.2d 895 (1950).

What does section 11 of chapter 200 of the 1975 amendment do? The crucial language is in subsection (4) of section 11, and provides:

(4) Authority granted by chapter 90.58 RCW, the "Shoreline Management Act of 1971", except that in relation to "shorelines" as defined in RCW 90.58.030, the following shall apply:

(a) The forest practice regulations adopted pursuant to this chapter shall be the sole rules applicable to the performance of forest practices, and enforcement thereof shall be solely as provided in chapter 76.09 RCW;

(b) As to that road construction which constitutes a substantial development, no permit shall be required under chapter 90.58 RCW for the construction of up to five hundred feet of one and only one road or segment of a road provided such road does not enter the shoreline more than once. Such exemption from said permit requirements shall be limited to a single road or road

segment for each forest practice and such road construction shall be subject to the requirements of chapter 76.09 RCW and regulations adopted pursuant thereto and to the prohibitions or restrictions of any master program in effect under the provisions of chapter 90.58 RCW. Nothing in this subsection shall add to or diminish the authority of the shoreline management act regarding road construction except as specifically provided herein. The provisions of this subsection shall not relate to any road which crosses over or through a stream, lake, or other water body subject to chapter 90.58 RCW;

(c) Nothing in this section shall create, add to, or diminish the authority of local government to prohibit or restrict forest practices within the shorelines through master programs adopted and approved pursuant to chapter 90.58 RCW except as provided in (a) and (b) above.

Any powers granted by chapter 90.58 RCW pertaining to forest practices, as amended herein, are expressly limited to lands located within "shorelines of the state" as defined in RCW 90.58.030.

In understanding the Shoreline Management Act of 1971, and the impact of the Forest Practices Act of 1974, it is crucial to make the determination as to the various types of shorelines involved in management of the "shorelines of the state." RCW 90.58.030(2)(d) defines "shorelines" as all water areas including wetlands *except* shorelines of state-wide significance, lakes below 20 acres and streams of limited mean annual flow. RCW 90.58.030(2)(e) lists the specific categories of "shorelines of state–wide significance". RCW 90.58.030(2)(c) defines "shorelines of the state" as the "total of all 'shorelines' and 'shorelines of state–wide significance' within the state".

Thus, after the effective date of the 1975 amendments, the forest practices regulations adopted for "shorelines" shall be promulgated by the forest practices board. RCW 76.09.040. The regulations of the forest practices board shall be the sole regulations for forest practices within the "shorelines". Furthermore, for certain kinds of road construction within the "shorelines" no permit from local government under the SMA shall be required. Laws of 1975,

1st Ex. Sess., ch. 200, § 11(4)(b), p. 676; WAC 222-50. As to "shorelines of state-wide significance", local government retains its same power under the SMA, including the power to issue permits. Laws of 1975, 1st Ex. Sess., ch. 200, § 11(4)(c), p. 676. I find it hard to conceive of a more complete preemption of authority.

The only cases the majority uses to discuss the issue of preemption are *Simpson Timber Co. v. Olympic Air Pollution Control Authority*, 87 Wn.2d 35, 549 P.2d 5 (1976); and *Edmonds School Dist. 15 v. Mountlake Terrace*, 77 Wn.2d 609, 465 P.2d 177 (1970). Neither case, however, is concerned with the requirements of article 2, section 37, and neither is in point.

The majority cites *State ex rel. Arnold v. Mitchell*, 55 Wash. 513, 104 P. 791 (1909), in support of its position. The facts in *Mitchell,* however, were radically different from those in the case before us. In *Mitchell,* a 1907 act of the legislature relating to the direct primary was significantly amended by a 1909 statute. However, the 1909 statute which purported to amend the direct primary law did not cite it and failed even to make a "suggestion of an amendment" to the primary law. *Mitchell,* at 516.

This is not the situation here. Laws of 1975, 1st Ex. Sess., ch. 200, § 11(4), p. 676, specifically mentions RCW 90.58, the Shoreline Management Act of 1971, and RCW 90.58-.030, containing the definitions of "shorelines" and "shorelines of the state".

*Flanders v. Morris,* 88 Wn.2d 183, 558 P.2d 769 (1977), also is claimed to support the majority view. Again, the facts are completely different and the case inapposite. In *Flanders,* the court struck down an attempt by the legislature to amend the codified public assistance laws by a proviso in the uncodified supplemental appropriations act. With no reference to the codified public assistance laws, which had no age limitation for the receipt of general assistance, the uncodified appropriations bill set 50 as the lower age limit for persons receiving public assistance. In

commenting on this action as it related to article 2, section 37, we said:

> For 37 years, the statutory law of this state has provided for public assistance on the basis of need with no age restriction. The new restriction is clearly an amendment to RCW 74.04.005, adding to the restrictions already enumerated there. However, the statute will never reflect this change but will continue to read as it always has, with no age restriction. One seeking the law on the subject would have to know one must look under an "appropriations" title in the *uncodified* session laws to find the amendment. The fact that the budget bill is not codified strikes at the very heart and purpose of Const. art. 2, § 37.

*Flanders,* at 189.

The majority neglects to note that the language of the court was directed against the uncodified nature of the appropriations bill and not, as it implies, against the fact that the language of the codified portion of the public assistance act would not reflect the change. The situation here is not analogous to the *Flanders* case. It is a novel doctrine completely foreign to previous decisions of this court to suggest, as the majority seems to do, that article 2, section 37, requires not only the *amendatory* statute but also the *affected* statute to contain the full text of the amendatory language. To adopt the interpretation of the majority would hopelessly clutter the session laws and the code and lead to confusion, not clarity. It has not been before and should not now be the law of this state.

The Forest Practices Act of 1974 is a carefully drawn statute which attempts to provide sound policies of management for an important natural resource of the state. It provides for the kind of coordinated planning to protect the public interest which is also the goal of the Shoreline Management Act of 1971. *See* RCW 76.09.010; RCW 90.58.020. It has as one of its purposes the avoidance of unnecessary duplication in the regulations of forest practices. Laws of 1975, 1st Ex. Sess., ch. 200, p. 665, both amended the existing Forest Practices Act of 1974, RCW 76.09, Laws of 1974,

1st Ex. Sess., ch. 137, p. 401, and transferred the power to regulate forest practices in the "shorelines" from one office of government—local government—to another office—the forest practices board. It is a complex statute which must be read carefully. But just because it is complex does not mean it is unconstitutional. The act meets our previously announced tests for constitutionality under article 2, section 37. It is constitutional, and this court should so find.

I dissent.

BRACHTENBACH and HICKS, JJ., concur with DOLLIVER, J.

Reconsideration denied June 21, 1979.