[No. 32471-7-II.   Division Two.   March 28, 2006.]

WASHINGTON SHELL FISH, INC., *Appellant*, v. PIERCE COUNTY, *Respondent.*

*Carolyn A. Lake* (of *Goodstein Law Group, P.L.L.C.*), for appellant.

*Gerald A. Horne, Prosecuting Attorney for Pierce County,* and *Bertha B. Fitzer* and *Jill Guernsey, Deputies,* for respondent.

¶1 HUNT, J. — Washington Shell Fish (WSF) appeals the superior court's affirmance of Pierce County's (County) orders to cease and desist planting and harvesting geoducks without shoreline permits and to cease and desist working in eelgrass beds without authorization on 11 leased shoreline properties. WSF argues the County's orders were improper because WSF was not required to obtain a substantial shoreline development permit to engage in geoduck cultivation or to obtain County approval to work in eelgrass beds. We disagree and affirm.

## FACTS

### I. BACKGROUND

¶2 WSF is in the business of geoduck aquaculture. WSF began aquaculture and harvesting activities in summer 2001. By mid-2003, WSF had leased 11 parcels of shoreline lands from nine separate owners: Ohlson Properties (Ohlson), Edward and Laureen Miller (Miller), Vella Boyles (Boyles), J.G. Olson (Olson) (two parcels), Robert Ryan (Ryan), the County,[1] Darrell Detienne (Detienne), Tacoma DeMolay Boys Camp (DeMolay) (two parcels), and Ronald and Eileen Tellefson (Tellefson).

¶3 WSF conducts the following geoduck activities: (1) harvesting and planting on the County property; (2) harvesting and inadvertent planting on one Olson property and only harvesting on the other Olson property;[2] (3) harvesting on the Ryan, Detienne, Boyles, and Miller properties; and (4) test planting on the DeMolay property. WSF conducts no geoduck activities on the Tellefson property.

¶4 On the County shoreline, WSF wants to start a five-year-rotation aquaculture cycle: Each year, WSF would plant geoduck seeds[3] on 20 percent of its leased property for harvest five years later. To plant geoducks, WSF pushes 6- to 12-inch long, 3-inch diameter, polyvinylchloride (PVC) pipes into the shoreline using rope to guide tube placement. WSF has installed more than 21,000 such PVC pipes on its leased County shoreline. The photo below, admitted as Exhibit 50, shows WSF employees inserting PVC geoduck planting pipes in eelgrass beds:

---

[1] The validity of this lease is the subject of separate litigation, which is not part of this appeal.

[2] WSF also harvested and planted manila clams on the Ohlson property.

[3] The manila clam activity is not part of this appeal.

¶5 WSF places geoduck seeds into the PVC pipes, covers the pipes with netting, and pins and wire-ties the netting cover in place to protect the geoduck seedlings. After six months, WSF removes the netting and pipes to allow the geoduck seeds to grow naturally.

¶6 When the planted geoducks mature five years later, divers use high-pressure water jets to harvest them from their burrows three to four feet down in the sand substrate. From a boat anchored off shore, the harvesters dive down to the bottom, insert a water jet into the sand substrate next to the geoduck, use water jets to excavate the substrate around the geoduck and loosen its grip, and then pull the geoduck out of the sand. In the process, loosened sand and

silt move around in the nearby saltwater. Removal of each geoduck leaves an excavation pit in the sand substrate one and a half to two feet in diameter.

¶7 When WSF first began its geoduck planting and harvesting activities and its work in eelgrass beds, it had neither sought nor obtained the necessary permits and authorizations.[4]

## II. Cease and Desist Orders

¶8 The County received numerous complaints about WSF's harvesting and aquaculture activities. Beginning in June 2003, the County issued a series of cease and desist orders, applicable to all 11 leased properties, requiring WSF to stop its geoduck operations under Title 20 of the Pierce County Code (PCC) and to stop working in eelgrass beds under Title 18E of the PCC.

### A. County Orders

¶9 Included in the record on appeal are 12 cease and desist orders the County issued for WSF-leased properties.[5] All 12 orders contain the following operative language:

YOU ARE HEREBY NOTIFIED that you are making or partaking in a use of the land, development or activity(ies) which is not permitted by County regulation, approved site plan, land use permit, or variance, to-wit:

| References: | Description of Violation: |
| --- | --- |
| PCC. Title 20 Section 20.24.030 | Harvesting cultivating planting or allowing such activity without required shoreline permits. |
| PCC. Title 18E Section 18E.60.020[6] | Working or allowing working to be done in eelgrass beds without authorization. |

---

[4] Although WSF eventually applied for the permits, apparently none had been issued when the instant litigation began.

[5] Two of these orders, which appear to be duplicates, collectively list 10 different parcel numbers. The other 10 orders list individual lots separately, with all but 1 duplicating the collective orders.

[6] Although the County's orders state PCC "18E.60.020," it most likely meant "18E.40.020." We do not address this issue as neither party raises it on appeal.

YOU ARE HEREBY NOTIFIED that you must immediately CEASE AND DESIST from the activity described in the above or attachment which is in violation of the PIERCE COUNTY CODE.

Administrative R. at 150-51. WSF appealed these cease and desist orders to the County hearing examiner.

## B. Appeal to Hearing Examiner

¶10 A County hearing examiner conducted a hearing on September 15 and November 3, 2003. Testifying were the parties' representatives, experts, WSF employees, and members of the general public affected by WSF's activities. Dr. Ron Thom testified as an expert eelgrass witness for the County. Dr. Daniel Cheney testified as an expert eelgrass witness for WSF.

¶11 Dr. Thom works primarily on eelgrass and eelgrass ecology for Battelle, one of nine United States Department of Energy marine sciences laboratories. He testified that (1) there were eelgrass beds on shorelines WSF had leased from the County, Olson, Ryan, and Detienne; (2) WSF had planted geoduck seeds with PVC pipes in existing eelgrass beds on the County property; and (3) the entire property WSF leased from the County is inshore below 18 feet.

¶12 Dr. Cheney testified that the evidence did not show WSF had planted in or harmed eelgrass, suggesting that eelgrass may have migrated into the areas after WSF planted geoduck seeds there. Dr. Cheney had not visited any of the properties to observe or to test the affected eelgrass beds. And WSF did not submit the information on which Dr. Cheney had relied. The hearing examiner did not find Dr. Cheney's testimony persuasive.

¶13 Members of the public also testified at the hearing, including: John Petrich, who lives next to the DeMolay property; Larry and Nanci Wakefield, who reside near the

Olson and County properties on Purdy Spit; and Robert Paradise, a recreational windsurfer, who testified on behalf of himself and members of the Boeing Windsurfing Club, the Northwest Board Sailors Association, Columbia Gorge Windsurfing Association, and Northwest Women of Wind.[7] These witnesses testified that they saw (1) heavy rope-like netting laid out, long metal stakes, and loose PVC pipes enmeshed in the nets over WSF's geoduck beds; (2) PVC pipes sticking out of the water and pipes placed into the ground for planting or cemented into five-gallon cement cans to serve as dive markers; and (3) several hundred feet of nylon rope that would entangle with other objects in the water or injure windsurfers. According to one witness, WSF used multiple boats, some large enough to drag buoys.

¶14 On December 4, 2003, the hearing examiner upheld the County's cease and desist orders. The examiner found that WSF (1) had caused substantial interference with the public's use of surface water, contrary to PCC 20.24.030 (Shoreline Management Act)[8]; (2) harvested geoducks in water less than 18 feet deep, contrary to RCW 77.60.070 (formerly RCW 75.24.100 (2000)); (3) operated in eelgrass beds;[9] and (4) continued to operate illegally without permits, even though WSF was on notice that they were required.

### III. LUPA PETITION

¶15 On December 23, 2003, WSF filed a timely Land Use Petition Act (LUPA)[10] petition with the superior court. On

---

[7] Paradise estimated that 100 to 150 people windsurf at various times on or near the property WSF leased from Pierce County.

[8] Title 20 PCC is the county's Shoreline Management Act of 1971, chapter 90.58 RCW, regulations.

[9] Working in eelgrass beds without authorization violates Title 18E PCC (GMA). The hearing examiner, however, did not expressly mention this code provision in reciting WSF's violations.

[10] *See* ch. 36.70C RCW.

October 1, 2004, the superior court upheld the hearing examiner's decision, ruling that (1) substantial evidence supported the hearing examiner's findings of fact; (2) the examiner properly concluded that WSF needed a substantial development permit under the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW; and (3) substantial evidence supported the examiner's eelgrass findings. The court did not otherwise rule on the propriety of the eelgrass bed cease and desist orders under the Growth Management Act, chapter 36.70A RCW (GMA), because it determined that WSF's failure to satisfy the SMA substantial development permit requirement independently supported the County's cease and desist orders.

¶16 WSF appeals both the SMA (geoduck planting and harvesting) and GMA (working in eelgrass beds) components of the County's cease and desist orders.

## ANALYSIS

¶17 WSF argues (1) it was not required to obtain a SMA substantial shoreline development permit before engaging in geoduck planting and harvesting on its leased shorelines; and (2) it was not required to obtain GMA critical areas authorization to work in eelgrass beds before installing the PVC pipes, ropes, netting, and other objects. We disagree.

¶18 We first address whether WSF's activities constituted a "substantial development" under PCC 20.76.030, subject to the County's shoreline regulations and (2) if so, whether WSF was nevertheless exempt from the permit requirement under PCC 20.24.030(A). We next address whether WSF also needed prior County authorization under Title 18E PCC before it could do any kind of work in eelgrass beds, which are deemed critical area habitat under the GMA.

## I. Standard of Review

■ ¶19 LUPA establishes a uniform, expedited appeal process to provide consistent, predictable, and timely judicial review of land use decisions by local governments. RCW 36-.70C.010; *Samuel's Furniture, Inc., v. Dep't of Ecology*, 147 Wn.2d 440, 449, 54 P.3d 1194 (2002). LUPA serves as the exclusive means of judicial review of land use decisions, unless a specific exception applies. RCW 36.70C.030.

■ ¶20 The party seeking LUPA review has the burden of proving that the challenged land use decision was an erroneous interpretation of the law, was not supported by substantial evidence, or violated that party's constitutional rights. RCW 36.70C.130. In reviewing administrative decisions, we review conclusions of law de novo.

■ ¶21 In addition, the SMA is broad. Courts must construe it liberally to give effect to its purpose. RCW 90.58.900.[11]

## II. Shoreline Substantial Development Permits: Geoduck Planting and Harvesting

### A. Shoreline Management Act

■■ ¶22 The legislature enacted the SMA: (1) to protect and to manage the private and public shorelines of Washington State; (2) to protect against adverse effects to public health, public rights of navigation, land, vegetation, and wildlife; and (3) to plan for and to foster reasonable and appropriate shoreline uses. RCW 90.58.020; *Samuel's Furniture*, 147 Wn.2d at 448. Permitted shoreline uses must be designed and conducted in a manner that minimizes damage to the ecology, damage to the environment, and interference with the public's use of Washington's water. RCW 90-.58.020. Accordingly, the SMA regulates "uses" of shore-

---

[11] *See English Bay Enters., Ltd. v. Island County*, 89 Wn.2d 16, 20, 568 P.2d 783 (1977) (mechanical clam harvesting is covered under the SMA because it involves dredging).

line waters as well as "developments" on them. *Clam Shacks of Am., Inc. v. Skagit County*, 109 Wn.2d 91, 95-96, 743 P.2d 265 (1987).

■ ¶23 Local governments have primary responsibility to administer the SMA. RCW 90.58.050. The state Department of Ecology (DOE) creates guidelines for local governments to follow in developing their local shoreline master programs. RCW 90.58.080(1). Local governments must develop and exclusively administer a shoreline permit system; together with the DOE, local governments must enforce these permit requirements. RCW 90.58.140(3); RCW 90-.58.210(1). This permit system encompasses substantial development permits, conditional use permits, and variances. RCW 90.58.140; WAC 173-26-241; *see Clam Shacks*, 109 Wn.2d at 95-97.

## B. Pierce County's Shoreline Master Program

¶24 Pierce County enacted its local shoreline master program under Title 20 of the Pierce County Code. PCC 20.02.010-.040. In its shoreline regulations, the County outlines general requirements and procedures for obtaining substantial development permits, variances, and conditional use permits, depending on the applicant's proposed activity and the type of shoreline environment involved. The regulations list several "uses" under chapters 20.22 to 20.70 PCC, the requirements for which may differ.

### 1. Substantial Development

¶25 WSF argues that the SMA does not apply to its geoduck planting and harvesting activities because they are not "substantial developments" under the County's shoreline regulations. WSF contends these activities are not "developments" because (1) they do not involve removal of sand, gravel, or minerals and (2) they do not interfere with the public use of surface water. We disagree. Like the hearing examiner, we focus on the second factor—interference with the normal public use of surface waters.

¶26 A party must apply for a shoreline substantial development permit if the development or proposed use falls within the following criteria: First, the development or use will involve

> the construction or exterior alteration of structures, dredging, drilling, dumping, filling, removal of any sand, gravel, or mineral, bulkheading, driving of piling, placing of obstructions, or any project of a permanent or temporary nature *which interferes with the normal public use of the surface of waters* overlying lands subject to the Shoreline Management Act at any state of water level.

PCC 20.76.030(A)(1) (emphasis added); *see* PCC 20.02.030; RCW 90.58.030(3)(d). Second, the "development or use exceeds a cost or fair market value of $2,500.00." PCC 20.76.030(A)(1).

### a. "development"—interference with public use

¶27 Several witnesses testified that WSF left rope in the water where WSF had planted geoducks, and this rope would become entangled with people or nongeoduck-harvest-related objects. WSF divers harvesting geoducks placed markers on the water's surface that prevented public use of that area. The PVC planting pipes that WSF inserted into the shorelines were up to 12 inches long, with their top portions protruding vertically out of the sand. In addition, according to one witness, WSF used up to four boats at a time to store the geoducks that divers harvested, one of which was a barge large enough to drag a buoy; these WSF boats further constricted the water surface open to public use.

¶28 In these ways, WSF's activities prevented the general public from using certain areas of the water: (1) WSF's geoduck planting and harvesting equipment posed a safety risk to the public and (2) WSF's activities and fixed objects occupied shoreline water, thereby excluding others. The testimony and exhibits provided substantial evidence to support the hearing examiner's finding that WSF's geoduck

activities interfered with the normal public use of the surface water.[12] Therefore, under PCC 20.76.030, WSF engaged in "development" when it harvested and planted geoducks on the leased properties.

### b. "substantial"—more than $2,500 value

¶29 Although the hearing examiner did not list the exact cost or fair market value of WSF's aquaculture activities, he did find that WSF engaged in "substantial" development. The existence of a "substantial" development means that the cost or fair market value of the development exceeded $2,500. And "fair market value"

> of a development is the open market bid price for conducting the work, using the equipment and facilities, and purchase of the goods, services and materials necessary to accomplish the development. This would normally equate to the cost of hiring a contractor to undertake the development from start to finish, including the cost of labor, materials, equipment and facility usage, transportation and contractor overhead and profit. The fair market value of the development shall include the fair market value of any donated, contributed or found labor, equipment or materials.

WAC 173-27-030(8).

¶30 WSF had at least two permanent employees—the owner and his executive assistant. WSF employed other workers to plant and to harvest geoducks. WSF maintained or purchased several pieces of equipment, including boats, PVC pipes, netting, containers, rope, and geoduck-harvesting water-jet devices. In addition, at a separate facility, WSF bred cultivated geoducks to plant on its leased shore-

---

[12] WSF also argues that it merely disrupted, but did not *remove*, sand when it used water jets to harvest geoducks. But the hearing examiner did not expressly address WSF's sand removal; rather, he based his decision on WSF's interference with the public's use of the surface water. Interfering with public use of the surface water is a sufficient ground, standing alone, to support the hearing examiner's findings and the cease and desist orders as they relate to geoduck planting and harvesting. Thus, we do not address whether disrupting sand provides a separate basis for requiring a substantial development permit under Pierce County's shoreline regulations.

line, and it extracted at least $2.7 million worth of wild geoducks from the Pierce County property alone. Thus, the value of WSF's geoduck planting and harvesting developments on its leased shorelines exceeded $2,500.

¶31 We hold, therefore, that the hearing examiner properly determined that WSF engaged in shoreline development worth more than $2,500 when it harvested and planted geoducks. This activity thus constituted a "substantial" development under PCC 20.76.030 on the WSF leased shorelines in which WSF engaged in geoduck activities.[13]

¶32 Having determined that WSF's geoduck activities are substantial developments subject to Pierce County's shoreline regulations, other than on the Tellefson and Ohlson properties, we next determine whether these activities are exempt under PCC 20.24.030(A) as WSF contends.

### 2. No exemption

¶33 WSF argues that under PCC 20.24.030(A), geoduck harvesting does not require a substantial development permit because this activity is "permitted outright." In addition, WSF urges us to interpret the phrase "Subject to the Guidelines for Reviewing Substantial Development Permits," PCC 20.24.030(A), as simply "language that shoreline 'development' must be consistent with 'guidelines.'" Appellant's Br. at 15. Again, we disagree.

■■ ¶34 We interpret local ordinances and codes as we interpret statutes, employing the general rules of statutory construction. *Neighbors of Black Nugget Rd. v. King County*, 88 Wn. App. 773, 778, 946 P.2d 1188 (1997), *review denied*, 135 Wn.2d 1003 (1998). As with statutes, we must ascertain and carry out the intent and purpose of the local

---

[13] WSF apparently did not engage in geoduck planting or harvesting on the Tellefson or Ohlson properties. We do not, however, address these properties separately because WSF neither makes such distinction itself nor asks us to distinguish these properties. Moreover, if WSF did not engage in geoduck activities on the Tellefson and Ohlson properties, then the SMA portion of the nominally applicable orders do not affect these properties.

legislative body promulgating a local ordinance or code. *Neighbors*, 88 Wn. App. at 778. To determine legislative intent, we look first to the plain language of the ordinance. *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002).

¶35 PCC 20.24.030(A) is not ambiguous, especially when read in context. PCC 20.24.030 regulates only two types of activities: geoduck harvesting, under subsection (A); and aquaculture, under subsections (B) through (D). Shoreline environment designations vary from "urban to natural"; these designations determine the level of restriction and the type of permit required.

¶36 For example, PCC 20.24.030(A) provides, in part:

(A) *Subject to the Guidelines for Reviewing Substantial Development Permits*, geoduck harvesting is *permitted outright* in all shoreline environments.

(1) Geoduck harvesting is to be conducted in a manner consistent with RCW 75.24.100 . . . .

(Emphasis added.) Former RCW 75.24.100 (1999), recodified as RCW 77.60.070(1), states in pertinent part: *"The director may not authorize commercial harvest of geoduck clams* from bottoms that are shallower than eighteen feet below mean lower low water (0.0. ft.) . . . ." (Emphasis added.) Contrary to WSF's contentions, the language of this ordinance does not exempt commercial geoduck harvesting from the need for a shoreline substantial development permit.

¶37 The PCC 20.24.030(A) phrase "[s]ubject to[14] the Guidelines for Reviewing Substantial Development Permits" clearly subjects geoduck harvesting to one overall qualifier—substantial development permit review under PCC 20.24.020, which is titled "Guidelines for Reviewing

[14] Other chapters within the County's shoreline regulations contain a "subject to" requirement similar to that in PCC 20.24.030(A). Also similarly, several other shoreline "use" regulations do not specify that a substantial development permit is required. *See, e.g.*, ch. 20.26 PCC (breakwaters); ch. 20.44 PCC (landfills).

Substantial Development Permits." Although PCC 20.24-.020 expressly addresses how the County reviews substantial development permit applications, it says nothing about exempting geoduck harvesting from the substantial development permit requirement.

¶38 Similarly, the PCC 20.24.030(A) clause that geoduck harvesting is "permitted outright in all shoreline environments" does not absolve WSF of the need for a shoreline substantial development permit. Instead, it means simply that (1) geoduck harvesting, as contrasted with some other use, like building a dock, for example, is permitted in these shoreline environments and (2) therefore, WSF need not apply for and obtain a conditional or special use permit to harvest geoducks along its leased shorelines.[15]

¶39 "Permitted outright" is a technical term specifically related to the type of activity presumptively allowed in certain zones; as such, it should be given its technical meaning. *See City of Spokane v. Dep't of Revenue*, 145 Wn.2d 445, 452, 38 P.3d 1010 (2002). According to other County development regulations, if a specific use is "permitted outright," a party is not required to obtain a conditional use permit, a nonconforming use permit, or an administrative use permit.[16] Nonetheless, that party may still need to obtain other applicable permits, such as: a commercial fishery license, if harvesting shellfish to sell;[17] a building permit, if building a hatchery;[18] or, in WSF's case, a substantial development permit for engaging in a

---

[15] In contrast, to engage in any nongeoduck harvesting activity, the applicant may also need a conditional use permit, depending on the type activity to be undertaken and the type of shoreline environment affected. *See* PCC 20.24.030(B) through (D). For example, the County may require a conditional use permit for developments involving land-based structures in a "Conservancy Environment." PCC 20.24.030(C); *see also* PCC 20.24.030(D).

[16] *See, e.g.*, PCC 18.25.030 (Sign, Identification—Residential); PCC 18A.33.050; PCC 18A.33.180; PCC 18A.35.060; PCC 18A.35.130-.140; PCC 18A.85.040; PCC 19A.120.040; PCC 20.28.040.

[17] *See* ch. 77.65 RCW.

[18] *See* ch. 19.27 RCW.

shoreline activity valued at more than $2,500—geoduck aquaculture.[19]

¶40 Further emphasizing that commercial geoduck harvesting is subject to the substantial development permit process is the remainder of PCC 20.24.030, which limits the types of uses in various shoreline environments:

(B) **Urban, Rural-Residential, and Rural Environments.** *Aquaculture operations are permitted subject to the Guidelines for Reviewing Substantial Development Permits.*

(C) **Conservancy Environment.** Aquaculture operations which do not involve the placement of land based structures are permitted *subject to the Guidelines for Reviewing Substantial Development Permits.*

Aquaculture operations which involve the development of land based structures are allowed as Conditional Uses and subject to the Guidelines for Reviewing Substantial Development Permits.

(D) **Natural Environment.** Aquaculture operations are limited to fishing and the harvesting of wild and planted stocks for recreation and commercial purposes. *Operations which do not involve the placement of structures or fill in the aquatic or terrestrial environment will be allowed as a Conditional Use, upon showing the activity will not substantially change the character of the site or adversely affect natural populations and shall be subject to the Guidelines for Reviewing Substantial Development Permits.* Operations involving structural developments are prohibited.

PCC 20.24.030 (emphasis added). As in subsection (A), these subsections each include the caveat: "Subject to the Guidelines for Reviewing Substantial Development Permits." PCC 20.24.030(B), (C), and (D). Even the harvesting of wild geoducks in natural environments requires a conditional use permit, and structures are prohibited altogether. PCC 20.24.030(D).

¶41 WSF admitted engaging in both planting cultivated geoducks and harvesting wild geoducks on the leased lands

---

[19] *See* ch. 90.58 RCW; *see also* ch. 20.76 PCC.

(except for the Tellefson and Ohlson properties). Neither activity is exempt from substantial development permit requirements under PCC 20.24.030: harvesting activities are subject to PCC 20.24.030(A) and planting activities are subject to PCC 20.24.030(B) through (D). Because WSF's geoduck activities constituted substantial developments, WSF had to apply for and to obtain the required permits before planting *or* harvesting geoducks.[20]

¶42 We hold, therefore, that the County properly issued cease and desist orders for properties on which WSF engaged in nonpermitted planting or harvesting geoducks, except for the Tellefson and Ohlson properties.[21]

### III. GROWTH MANAGEMENT ACT: WORKING IN EEL GRASS BEDS

¶43 In addition to the cease and desist orders to stop geoduck activities in shoreline areas, based on WSF's failure to obtain the necessary shoreline substantial development permits, the County also ordered WSF to cease doing *any* type of work in eelgrass beds, geoduck-related or not, because WSF had failed to obtain advance authorization under the GMA, PCC 18E.60.020, to conduct work activities in critical habitat areas.

¶44 WSF contends that the County could not prohibit work in eelgrass beds under its GMA regulations, Title 18E PCC, because these regulations require only that it must conduct its work in a manner sensitive to habitat function without harming the eelgrass.[22] Again, WSF's arguments fail.

---

[20] WSF may also have failed to obtain a commercial shellfish license for harvesting wild manila clams and geoducks under RCW 77.65.010. We need not address this issue, however, because it is not before us in this appeal.

[21] As we note above, the County does not dispute that WSF did not engage in geoduck harvesting or planting on the Tellefson and Ohlson properties.

[22] WSF argues that it was not required to obtain a permit under the SMA to work in eelgrass beds unless the County can show that WSF's activities actually adversely affected eelgrass. This argument also fails. The County ordered WSF to cease working in eelgrass beds under its GMA (growth management) regulations, Title 18E PCC, not under its SMA (shoreline) regulations, Title 20 PCC. Whether WSF's activities adversely affected eelgrass is irrelevant for purposes of the SMA's

## A. Critical Areas—Fish and Wildlife Habitat—Eelgrass Beds

¶45 The GMA requires counties to develop regulations to assure conservation of land and resources by designating critical areas, including fish and wildlife habitat. RCW 36.70A.030(5), .060, and .170(1)(d). Pierce County enacted development regulations for critical areas under Title 18E PCC. These regulations require County approval for certain activities in critical areas, such as dredging and destroying vegetation.

¶46 These regulations define "critical areas" as wetlands, flood hazard areas, *fish and wildlife habitat areas*, aquifer recharge areas, and geologically hazardous areas. RCW 36-.70A.030(5); PCC 18.25.030. Because eelgrass beds are a fish and wildlife habitat, PCC 18E.40.020(D), they are "critical areas" requiring County approval in order to conduct activities that could adversely affect their habitat function. *Cf. Orion Corp. v. State*, 103 Wn.2d 441, 460, 693 P.2d 1369 (1985); *Bellevue Farm Owners Ass'n v. Shorelines Hearings Bd.*, 100 Wn. App. 341, 346 n.11, 997 P.2d 380, *review denied*, 142 Wn.2d 1014 (2000). Thus, before engaging in any activity in an eelgrass bed, WSF was required to obtain County authorization, in addition to and separate from the shoreline substantial development permits it was required to obtain under the County's SMA regulations.

## B. Cease and Desist Orders—Eelgrass Beds

¶47 Dr. Thom testified that (1) he observed eelgrass beds on five WSF-leased properties, including the County, Olson,[23] Ryan, and Detienne properties and (2) the eelgrass likely existed before WSF began its aquaculture and geoduck harvesting activities. The photo exhibits show

---

objective to protect habitat from *potential* harm by requiring advance County approval before work is undertaken in eelgrass beds.

[23] The Olson property includes two separate, but contiguous, parcels of land.

existing eelgrass beds where WSF is placing PVC pipes for planting geoduck seeds on the County property. *See* Ex. 13 (eelgrass at the County site); Exs. 50-59 (WSF employees planting PVC pipes at the County site). This evidence shows that WSF conducted activities in eelgrass beds on at least the leased County shoreline. It is undisputed that WSF lacked the required GMA authorization.[24] That WSF thereby violated County regulations, specifically PCC 18E.60.020, supports the County's order that WSF cease and desist from working in eelgrass beds.

¶48 We note that the chapter 18E PCC portion of County's cease and desist orders include all of WSF's leased properties. Nonetheless, these orders do not command WSF to cease *all work* on *all* these properties. Rather, the orders command WSF to cease only the described activity "which is in violation of the PIERCE COUNTY CODE," namely PCC 18E.60.020. Therefore, insofar as WSF was not working in eelgrass beds on some of its leased properties, either because those properties did not contain eelgrass beds or because WSF was conducting its activities away from eelgrass beds, the cease and desist orders to stop working in eelgrass beds without authorization do not apply.

¶49 We hold that the County properly ordered WSF to cease working in eelgrass beds on the County property, where the record shows and the hearing examiner found that WSF was working without the necessary County authorization.[25]

---

[24] Although WSF admitted it had worked in eelgrass beds, it disputes that this work damaged the eelgrass. Whether WSF's prior activities damaged or adversely impacted eelgrass has no bearing on whether the County's GMA regulations require WSF to obtain County approval *before* undertaking operations in areas that contain fish or wildlife habitat, such as eelgrass beds.

[25] As we previously noted, the hearing examiner found that WSF worked in eelgrass beds on the County property. Although the hearing examiner found, as Dr. Thom testified, that eelgrass beds were present on four other properties (Olson (two properties), Ryan, and Detienne), the hearing examiner did not specifically find that WSF worked in the eelgrass beds on these properties. Thus, absent a finding that WSF worked in eelgrass beds on these four properties, it did not violate PCC 18E.60.020 and, therefore, the County's order to cease and desist working in eelgrass beds did not apply to these four properties.

IV. CONSTITUTIONAL RIGHTS

¶50 Finally, WSF argues that (1) the County's cease and desist orders violated its right of procedural due process[26] because the County failed to provide notice and hearing before issuing these orders and (2) the cease and desist orders constituted an unconstitutional taking without just compensation.[27] Both arguments fail for lack of supporting argument in WSF's brief. First, although WSF complains that the County failed to give notice, WSF provides little or no argument on this issue.[28] Similarly, except for a single sentence in its brief, WSF failed to make a takings argument.[29] Accordingly, we need not address these issues. *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004) (courts decline review for inadequate arguments in brief).

¶51 We hold that the County did not violate WSF's constitutional right of due process. And because WSF failed to exhaust administrative remedies and to support adequately its argument on appeal, we will not consider its constitutional takings claim.

¶52 Affirmed.

VAN DEREN, A.C.J., and PENOYAR, J., concur.

Review denied at 158 Wn.2d 1027 (2007).

---

[26] U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3.

[27] WASH. CONST. art. I, § 16.

[28] We further note that WSF's due process claim also fails because WSF did not have a valid existing property interest in planting or harvesting geoducks on its leased land because it was undertaking these activities without first obtaining the necessary County permits. Absent a valid property interest, the County was not required to hold a hearing before issuing the cease and desist orders. *See Nguyen v. Dep't of Health*, 144 Wn.2d 516, 526-28, 29 P.3d 689 (2001) (hearing prior to professional license revocation).

[29] WSF's takings claim also fails because WSF failed to raise this issue during the administrative hearing below. Therefore, WSF cannot now claim an unconstitutional taking for the first time on appeal. *See Orion Corp. v. State*, 109 Wn.2d 621, 632, 747 P.2d 1062 (1987) (exhaustion of administrative remedies required under the Washington Constitution).