

2015 JUL -6 AM 9: 00

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| POST-CONFIRMATION COMMITTEE OF IN RE PIERCE COUNTY HOUSING AUTHORITY, | ) ) ) ) | No. 72116-0-I |
| Appellant, | ) ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| PIERCE COUNTY, a political subdivision of the State of Washington, | ) ) ) ) | |
| Respondent. | ) ) | FILED: July 6, 2015 |

SPEARMAN, C.J. — This case arises from 2008 negligence claims asserted by tenants of a building owned and operated by the Pierce County Housing Authority (PCHA) and PCHA's subsequent bankruptcy proceedings. The bankruptcy court appointed seven plaintiff-tenants to the Post-Confirmation Committee (appellant), which was empowered to assert any and all of PCHA's insurance coverage claims. In this case the Committee asserts a right, as PCHA's assignee, to coverage under the County's self-insurance fund for litigation costs and settlement amounts related to the claims asserted by the plaintiff-tenants. We affirm the trial court's entry of summary judgment for the County.

## FACTS

The PCHA is an independent non-profit corporation that was created in 1978 in order to oversee the provision of low income housing in Pierce County. Chapter 35.82 RCW. Under RCW 35.82.040, the Pierce County executive is tasked with appointing PCHA's commissioners. However, by statute, PCHA is an autonomous, self-governing organization, not a part of the Pierce County government. See generally, ch. 35.82 RCW.

In 2006, PCHA owned and operated the Eagle's Watch apartments, an affordable housing complex in Puyallup, Washington. The apartments had an extensive mold problem and 29 tenants had joined in a lawsuit against PCHA alleging they had suffered injury due to mold in their apartments. PCHA consistently denied liability and damages for any mold-related claims. It hired an attorney and spent approximately $1.2 million in legal fees defending against the claim. In late 2007, PCHA settled the case for a cash payment of $750,000.

In 2008, a second mold-related lawsuit was filed against PCHA by Eagle's Watch tenants. This time, 89 tenants claimed mold-related damages. Once again, PCHA hired attorneys to defend against the claim and, in October 2008, attempted to reach a mediated global settlement of all Eagle's Watch mold-related claims.

When no settlement was reached, PCHA filed a chapter 9 bankruptcy petition, claiming that the cost of defending itself against the tenant mold lawsuits had rendered it insolvent. The bankruptcy court found that PCHA was eligible to be a "debtor" under Chapter 9. Clerk's Papers (CP) at 66. The bankruptcy court

2

also determined that the tenants in the 2008 lawsuit were unsecured creditors in the bankruptcy proceeding and established the Post-Confirmation Committee, comprised of seven representative plaintiff-tenants.

On December 17, 2009, the bankruptcy court formally approved PCHA's Third Amended Plan.

The Plan set forth the amount to be paid by the PCHA and the priority of several "Allowed Claims," which included the mold-related negligence claims. CP at 76, 80. The Plan also ordered PCHA to "assign certain existing or alleged claims for which insurance coverage may exist to the Post-Confirmation Committee." CP at 84. It noted, "all Insurance Claims shall be administered by the Post-Confirmation Committee and consistent therewith all extensions of time in 11 U.S.C.108 shall apply. The Post-Confirmation Committee, in its discretion, may administer, pursue, or abandon any or all Insurance Claims. The ... Debtor shall take all steps reasonably necessary to facilitate the administration of the Insurance Claims by the Post-Confirmation Committee, and shall cooperate in ensuring that no legal rights thereunder are impaired, including if requested by the Post-Confirmation Committee, making an initial tender on the claim." CP at 85. "Insurance Claim(s)" was defined as, "[w]ithout limitation, any rights, claims, or causes of action owned by, or accruing to the Debtor [PCHA] under any policies of insurance issued to or on behalf of the Debtor or under which the debtor may otherwise be a beneficiary pursuant to any contract, statute, regulation or legal theory."

On October 19, 2012, the bankruptcy court issued an order transferring PCHA's assets, including its existing or alleged insurance claims to the Committee. CP at 96-97. The bankruptcy court's order also allowed the mold-related claims in the amount of $225,000.[1] CP at 97, 101-08. Following resolution of the bankruptcy, the County and the plaintiff-tenants stipulated to dismissal of the 2008 lawsuit. CP at 113.

Throughout the bankruptcy proceedings, PCHA had denied that it was covered under Pierce County's self-insurance fund. Nevertheless, on February 14, 2013, PCHA sent a letter to the Pierce County Risk Manager attempting to "tender" the mold claims to Pierce County.[2] Pierce County denied the tender in a letter dated February 25, 2013. CP at 116.

Thereafter, on September 30, 2013, the Committee asserted PCHA's insurance coverage claim in superior court. The Committee sought a declaratory judgment that, as PCHA's assignee, it was entitled to coverage from Pierce County's self-insurance fund "for some or all of [the plaintiff-tenants'] claims asserted and allowed against PCHA."[3] CP at 12. Pierce County moved for summary judgment, which the trial court granted, reasoning that PCHA was not covered under Pierce County's self-insurance fund. CP at 414.

The Committee appeals.

---

[1] This amount represents the combined claims of the seven members of the Post-Confirmation Committee.

[2] The letter submitted to the Pierce County Risk Manager by PCHA is not part of the record on appeal.

[3] The Committee did not specify whether it sought coverage for litigation expenses or the $225,000 in claims allowed by the bankruptcy court or both.

## DISCUSSION

The central dispute in this case is whether PCHA was covered under Pierce County's self-insurance fund for the 2008 mold claims authorized by the bankruptcy court. The self-insurance fund is maintained and administered by the County pursuant to Section 2.120 of the Pierce County Code (PCC). Accordingly, to resolve the issue, we must interpret provisions of the PCC.

Washington courts interpret local ordinances and codes as they interpret statutes, employing the general rules of statutory construction. Washington Shell Fish, Inc. v. Pierce County, 132 Wn. App. 239, 253,131 P.3d 326 (2006); Neighbors of Black Nugget Rd. v. King County, 88 Wn. App. 773, 778, 946 P.2d 1188 (1997). Our Supreme Court outlined the mode of statutory interpretation in Lake v. Woodcreek Homeowners Ass'n as follows:

> The court's fundamental objective in construing a statute is to ascertain and carry out the legislature's intent....Statutory interpretation begins with the statute's plain meaning. Plain meaning is to be discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole....While we look to the broader statutory context for guidance, we must not add words where the legislature has chosen not to include them, and we must construe statutes such that all of the language is given effect....If the statute is unambiguous after a review of the plain meaning, the court's inquiry is at an end....But if the statute is ambiguous, this court may look to the legislative history of the statute and the circumstances surrounding its enactment to determine legislative intent.

169 Wn.2d 516, 526-27, 243 P.3d 1283, 1288 (2010) (internal quotations omitted).

In this case, the Committee urges an interpretation of the PCC based on legislative history and opinions by former Pierce County officials regarding the

5

scope of coverage under the self-insurance fund. But, because the relevant provisions of the PCC are unambiguous, we are required to give effect to the plain meaning of the ordinances without reliance on legislative history or other extrinsic evidence of legislative intent.

PCC 2.120 governs County liability for officers and employees. Subsection .010 (Duty to Defend) provides:

> A. Pierce County agrees, *as a condition of...acceptance of services* to defend upon proper request, all civil claims...for damages brought or maintained against its officers, employees and/*or volunteers* arising out of the acts, errors or omissions in the performance or good faith attempt to perform, the official duties of said officer, employee or volunteer.

(Emphasis added). The Committee claims that the individual board members of PCHA are "volunteers," whose services Pierce County "accepts," within the meaning of subsection .010. The Committee notes that the board members are uncompensated and are, thus, volunteers in the ordinary sense. It also notes that they are appointed by the Pierce County Executive, confirmed by the County Council, and render a service the County is legally obligated to provide.[4]

But the PCC specifically limits coverage to "volunteers *who perform assigned or authorized duties* for Pierce County." PCC 2.120.070 (Application to Volunteers) (emphasis added). The code further limits coverage under the self-insurance fund to civil lawsuits that arise from circumstances in which the volunteer was "performing or making a good faith attempt to *perform those*

---

[4] Under RCW 35.82.040, if a city or County adopts a resolution declaring the need for a housing authority, it has an obligation to create such an authority and appoint commissioners to administer it.

*assigned or authorized duties."* PCC 2.120.070 (emphasis added). The Committee does not argue that Pierce County assigned or authorized duties undertaken by PCHA's board members and the record would not support such a contention.

Furthermore, Washington law is clear that the County has no such authority. Chapter 35.82 RCW vests the power to govern a housing authority and carry out its purpose within the authority itself, rather than the city/County that created it. See RCW 35.82.040 (vesting power to govern a housing authority in its commissioners and precluding commissioners from simultaneously serving as an officer or employee of the city/county that created the authority), RCW 35.82.070 (empowering a housing authority with all powers necessary or convenient to carry out and effectuate its purposes and the provisions of Ch. 35.82 RCW). Likewise, our Supreme Court has recognized that, though there is naturally a close relationship between housing authorities and the cities/counties that create them, housing authorities are, nevertheless, empowered by statute to self-govern. See Wilcox v. Housing Authority of King County, 66 Wn.2d 864, 869, 405 P.2d 723 (1965).

Because there is no indication that Pierce County assigned or authorized duties to PCHA's board members—or even had the authority to do so—we conclude that, under the plain language of the PCC, the board members are not "volunteers" subject to defense by the County under PCC 2.120.010.

Moreover, even if individual board members could be considered volunteers of Pierce County subject to coverage under PCC 2.120.010, the County was still entitled to judgment in this case for two reasons.

First, while the PCC requires the County to defend *individuals* who meet specific criteria, it does not require or authorize the defense of "a public body corporate and politic" such as a housing authority. RCW 35.82.070. Contrary to the Committee's assertions, the 2008 mold lawsuit did not name individual board members as plaintiffs. The suit named "Pierce County Housing Authority, a Washington State quasi-governmental entity, d/b/a Eagle's Watch Apartments" as one of two defendants.[5] Likewise, the bankruptcy court's order allowed the Committee's claims as against PCHA in its corporate capacity, not its individual board members. See CP at 96. As such, neither the 2008 action nor the claims allowed by the bankruptcy court triggered coverage under PCC 2.120.020.

Next, PCHA (and the Committee as its assignee) did not "properly request" a defense under PCC 2.120.020, which requires a party claiming coverage to file a written request for a defense with the County's risk manager and prosecuting attorney within seven days of receipt of notice of filing of the claim. PCC 2.120.020. In this case, PCHA never submitted a written request for a defense. Instead, it sent a letter attempting to "tender" the mold claims—which had already been settled by the bankruptcy court—to Pierce County for indemnification. CP at 116. This letter, dated February 14, 2013, was far from timely. The mold claims had been filed in 2008. Even allowing for the stay of

---

[5] The second named defendant is not party to this appeal.

8

superior court proceedings during the bankruptcy, the critical "filing" date, i.e., the date of the bankruptcy court's order allowing the tenants' claims to proceed, is October 19, 2012. At a minimum, PCHA's letter was sent four months too late.

Additionally, PCC 2.120.030(c) expressly states that if an otherwise covered volunteer elects to provide his or her own legal representation without the consent of the County, the County shall have no duty to pay or reimburse any costs incurred in the defense or any damages for which the volunteer becomes legally obligated. Here, it is undisputed that PCHA obtained legal representation in the 2008 lawsuit and settled the claims in bankruptcy court without the knowledge or consent of Pierce County. Thus, under PCC 2.120.030(c), the County has no duty to reimburse PCHA for either the cost of its defense or the settlement amounts ordered by the bankruptcy court.

We conclude that, under the plain meaning of PCC 2.120, Pierce County had no obligation to defend, reimburse or indemnify PCHA. Accordingly, the County was entitled to judgment.

Affirm.

WE CONCUR:

Spearman, C.J.

Dwyer, J.

Appelwick, J.