[No. 53228–1.   En Banc.   October 1, 1987.]

CLAM SHACKS OF AMERICA, INC., *Petitioner*, v.
SKAGIT COUNTY, ET AL, *Respondents*.

*Dennis D. Reynolds* and *Pressentin & Reynolds*, for petitioner.

*Michael E. Rickert, Prosecuting Attorney*, and *John R. Moffat, Chief Civil Deputy*, for respondent Skagit County.

*Kenneth O. Eikenberry, Attorney General*, and *Jay J. Manning, Assistant*, for respondent State.

*Richard U. Chapin* on behalf of ARCO Marine, Inc., and Northwest Tow Boat Association, amicus curiae for petitioner.

*Patrick D. Sutherland, Prosecuting Attorney for Thurston County*, and *Robert D. Tobin, Deputy*, on behalf of Washington Association of Counties; *Roger Kluck* and

*Peter T. Jenkins* on behalf of Washington Environmental Council, amici curiae for respondents.

BRACHTENBACH, J.—Does the Shoreline Management Act of 1971 (SMA), RCW 90.58, authorize local governments to require conditional use permits for shoreline activities which are not "developments" as defined by the SMA? The trial court and the Court of Appeals held there was such authority. We affirm.

This dispute arises from Clam Shacks' efforts to harvest clams commercially from leased, privately owned, mud–flat tidelands in Skagit Bay. The tidelands are within an area designated as "[s]horelines of state–wide significance". *See* RCW 90.58.030(2)(e)(ii)(D). Skagit County had adopted, and the Department of Ecology (DOE) had approved, a master program for Skagit County's shorelines (Skagit County Shoreline Master Program) (SCSMP).

Clam Shacks proposed to use a "hydraulic rake," a wheeled device with a pipe–like manifold between the wheels. The rake is used on mud flats at low tide. Nozzles along the manifold direct pressurized water into the sediment surface. The pressurized water stream temporarily liquifies the sediment, the clams break free, float to the surface, and are gathered by hand.

Clam Shacks applied for and later received from Skagit County a conditional use permit subject to conditions, including a requirement that Clam Shacks conduct a study of the effect of its operation on vegetation, wildlife, and water quality. The DOE approved the permit as required by RCW 90.58.140(12).

Shortly after Clam Shacks began harvesting, Skagit County issued a cease and desist order because of Clam Shacks' failure to sponsor the required study. Clam Shacks sought writs of prohibition and mandamus, contending that its harvesting was not a "substantial development" or an "aquacultural practice," and therefore not subject to permit requirements. The DOE was joined as a defendant.

The trial court granted summary judgment for Skagit County. The Court of Appeals affirmed. *Clam Shacks of Am., Inc. v. Skagit Cy.,* 45 Wn. App. 346, 352, 725 P.2d 459 (1986). We affirm.

The trial court held that Clam Shacks' harvesting operation was "aquaculture" and therefore required a conditional use permit under the SCSMP. The trial court further held that it did not need to decide whether Clam Shacks' operation constituted a "substantial development" under the SMA because conditional use permits could be required by county master programs for activities other than "developments" under the SMA. We agree.

Our analysis of the SMA must be made with the legislative mandate in mind:

> This chapter is exempted from the rule of strict construction, and it shall be liberally construed to give full effect to the objectives and purposes for which it was enacted.

RCW 90.58.900. The objectives and purposes of the SMA are set forth in RCW 90.58.020. Therein, the Legislature found that the shorelines are among the most valuable and fragile of the state's natural resources with ever increasing pressures of additional uses necessitating increased coordination in the management and development of the shorelines. It declared:

> It is the policy of the state to provide for the management of the shorelines of the state by planning for and fostering all reasonable and appropriate uses. This policy is designed to insure the development of these shorelines in a manner which, while allowing for limited reduction of rights of the public in the navigable waters, will promote and enhance the public interest. This policy contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally public rights of navigation and corollary rights incidental thereto.

Further,

> In the implementation of this policy the public's opportunity to enjoy the physical and aesthetic qualities

of natural shorelines of the state shall be preserved to the greatest extent feasible consistent with the overall best interest of the state and the people generally. To this end uses shall be preferred which are consistent with control of pollution and prevention of damage to the natural environment, or are unique to or dependent upon use of the state's shoreline.

Finally,

Permitted uses in the shorelines of the state shall be designed and conducted in a manner to minimize, insofar as practical, any resultant damage to the ecology and environment of the shoreline area and any interference with the public's use of the water.

RCW 90.58.020.

Shorelines of statewide significance, such as involved here, are accorded special emphasis. The interest of all the people is declared to be paramount in their management. RCW 90.58.020. The DOE is granted expanded power over master programs relating to shorelines of statewide significance to assure "optimum implementation" of the policy of the SMA. RCW 90.58.090(2).

The SMA places primary responsibility for initiating and administering the regulatory program upon local government units. The DOE acts essentially in a supportive and review capacity with emphasis on insuring compliance with the SMA. RCW 90.58.050. Central to the scheme of the SMA are local governments' master programs and their regulation of shoreline uses in a manner consistent with the guidelines developed in the SMA. RCW 90.58.080(2). Highly significant is RCW 90.58.100(1), which provides that local government master programs, when adopted and approved by the DOE, shall constitute *use* regulations for the various shorelines of the state. Master program is defined by RCW 90.58.030(3)(b) to mean the comprehensive *use* plan and the *use* regulations developed in accordance with the policies enunciated in RCW 90.58.020.

In addition to the broad grant of authority to local governments to create and adopt master programs, the SMA also provides a detailed permit process for substantial development and a restriction upon developments which

are not substantial development. RCW 90.58.140. "Development" and "substantial development" in this context are words of art by virtue of the definitions in RCW 90.58-.030(3)(d) and (e).

The trial court specifically refused to rule whether Clam Shacks' activity was a development or a substantial development. We likewise need not rule on the question because we conclude that Clam Shacks' activity is a regulated use under the SCSMP. The "development/substantial development" issue also is irrelevant since no such permit was required by Skagit County, nor sought by Clam Shacks.

Clam Shacks argues that the language of the statute and its application of the permit process only to substantial developments limits the SMA to developments as defined. Thus, Clam Shacks concludes there can be no use control, regardless of the master program, unless the activity involved constitutes a development. We disagree. Such construction would frustrate the declared policy of the SMA.

RCW 90.58.020 declares in part that the policy of the SMA is to provide for the shorelines by planning for reasonable and appropriate *uses* and states broadly the objective of permitted uses. Likewise, the definition of master program states that it "shall mean the comprehensive *use* plan . . . and the *use* regulations". (Italics ours.) RCW 90.58.030(3)(b). The DOE guidelines direct local governments to develop master programs for regulation of *uses* of shorelines. RCW 90.58.060(a), (b). Further, and consistently, RCW 90.58.100 states that the adopted and approved master programs shall constitute *use* regulations for the various shorelines of the state. The SMA also contemplates regulation of uses not constituting substantial developments, and thus not requiring permits, in its recognition of variance or conditional use provisions in local master programs. *See* RCW 90.58.100(5); RCW 90.58-.140(12).

This statutory language evinces a policy which allows regulation of uses on shorelines, not just regulation of statutorily defined "developments" on shorelines. The act spe-

cifically establishes a cooperative program of shoreline management between local governments and the state. Local governments are granted the primary responsibility for *initiating* and administering the *regulatory* program of the SMA. RCW 90.58.050.

It is true that "use" is not defined in the SMA while "development" and "substantial development" are defined. The permit process is limited to substantial developments while other developments must be consistent with the policy of the chapter, guidelines, rules and master program. RCW 90.58.140(1), (2). Had the Legislature intended to restrict the policy and impact of the SMA solely to statutorily defined "developments" it could have done so easily and with clarity. It did not, but instead chose the methodology of master programs by local governments overlaying the SMA permit process for substantial developments.

It is also true that the policy section, .020, uses the word "development," *e.g.,* "coordination in the management and development" of shorelines, inherent harm in "piecemeal development", and states that this policy is designed to insure development in a certain manner. RCW 90.58.020. It is apparent, however, that the word "development" in section .020 is used in its common, ordinary sense. A plain reading of this section alone leads one to the conclusion that both "use" and "development" are used in a broad, general sense. The language of section .020 hardly suggests that the meaning of "development" is restricted to the technical, detailed definition contained in RCW 90.58-.030(3)(d) and (e). In fact, the introductory clause to section .030 recognizes that the context of the definitions therein may require a different meaning.

In its common usage development means a gradual advance or growth through progressive changes. Use is a more comprehensive concept, that is, employing or using something. A development will always be a use. On the other hand, for example, one might use a shoreline for walking or fishing without developing it in the sense of changing it. In *English Bay Enters. v. Island Cy.,* 89 Wn.2d 16, 20, 568 P.2d 783 (1977) we held that it is not the goal of

the shoreline activity which is determinative, but rather the method used. Thus, if fishing were the goal, building a dock to enhance fishing might constitute a development, while fishing from the bank would not, even though the goal is the same. Bolstering our rationale are RCW 90.58.100(2)(b), (c) and (e) which mandate inclusion within the master program elements which clearly may affect use, but which do not necessarily constitute developments.[1]

We conclude that a narrow view of the applicability of the SMA as urged by Clam Shacks would be contrary to the legislative mandate that it be liberally construed to give full effect to its objectives and purposes. RCW 90.58.900.

Turning to the authorities, we do not find a case precisely in point. Clam Shacks' original brief relied principally upon *Weyerhaeuser v. King Cy.,* 91 Wn.2d 721, 592 P.2d 1108 (1979). That case is not controlling here. The first issue there was whether certain activities constituted a substantial development; the court found they did. The court dealt with conditions of a substantial development permit that attempted to regulate practices *outside* the shoreline. Clam Shacks quotes part of the opinion but omits the holding "that logging practices on lands adjacent to a shoreline may be regulated by means of the master program." *Weyerhaeuser,* at 736.

In its petition for review, Clam Shacks contends "the SMA has been interpreted consistently to regulate 'developments' only." That misstates the cases cited. For example, Clam Shacks asserts that "[t]he first decision of this

---

[1] "(2) The master programs shall include, when appropriate, the following:

". . .

"(b) A public access element making provision for public access to publicly owned areas;

"(c) A recreational element for the preservation and enlargement of recreational opportunities, including but not limited to parks, tidelands, beaches, and recreational areas;

". . .

"(e) A use element which considers the proposed general distribution and general location and extent of the use on shorelines and adjacent land areas for housing, business, industry, transportation, agriculture, natural resources, recreation, education, public buildings and grounds, and other categories of public and private uses of the land;" RCW 90.58.100(2)(b), (c), (e).

Court interpreting the SMA states that a project which is not a 'development' is beyond 'the purview of the Act'. *Narrowsview Preserv. Ass'n v. Tacoma*, 84 Wn.2d 416, 424–25, 526 P.2d 897 (1974). (Headnote six.)" The quoted material is not part of the decision. Rather it is taken from a headnote, which counsel indicated, but which is not authority; even the headnote does not mention "project." The case actually held that an act of rezoning in and of itself was not a substantial development. The other cases cited likewise were concerned with determining whether a particular activity was within the definition of substantial development.[2] None presented the main issue here presented, nor is any persuasive by analogy.

The Court of Appeals held that the trial court correctly determined that Clam Shacks' activity was "aquaculture" within the meaning of Skagit County's master program. The petition for review does not challenge this holding so we need not rule upon it. In Clam Shacks' reply to the response to the petition for review it contends that it requested review of the entire Court of Appeals opinion. That is not how an issue is raised on review. RAP 13.4(c)(5) requires a concise statement of the issues presented for review; RAP 13.7(b) limits review to only the questions raised in the petition, unless otherwise ordered by the court. In any event, we agree with the Court of Appeals holding.

Affirmed.

PEARSON, C.J., and UTTER, DOLLIVER, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

After modification, further reconsideration denied November 13, 1987.

---

[2]*English Bay Enters. v. Island Cy.*, 89 Wn.2d 16, 19–20, 568 P.2d 783 (1977); *Toandos Peninsula Ass'n v. Jefferson Cy.*, 32 Wn. App. 473, 484–85, 648 P.2d 448 (1982); *Hunt v. Anderson*, 30 Wn. App. 437, 439, 635 P.2d 156 (1981); *Ritchie v. Markley*, 23 Wn. App. 569, 572–73, 597 P.2d 449 (1979).