Honorable Patricia Lantz State Representative, 26th District P. O. Box 40600 Olympia, WA 98504-0600
Dear Representative Lantz:
By letter previously acknowledged, you have requested an opinion on the following questions, which we have paraphrased slightly for clarity:
 1. May the Department of Fish and Wildlife require hydraulic project approval permits under RCW 77.55.021 to regulate planting, growing, and harvesting of farm-raised geoduck clams by private parties?
 2. Should local governments require shoreline substantial development permits under RCW 90.58.140 for planting, growing, and harvesting farm-raised geoduck clams by private parties?
 3. If substantial development permits can be required for geoduck farming operations, how can local government and the Department of Ecology address existing operations?
 [original page 2] BRIEF ANSWERS
We answer the first question in the negative. RCW 77.115.010(2) limits application of Washington Department of Fish and Wildlife (WDFW) regulatory powers with respect to private sector cultured aquatic products. The limitation prevents WDFW from requiring a hydraulic project approval permit to regulate the planting, growing, and harvesting of geoducks grown by private aquaculturalists.
Regarding the second question, we conclude that farm-raised geoducks may require a substantial development permit under circumstances where the particular geoduck planting project causes substantial interference with normal public use of the surface waters. Projects that do not meet this description would not require a substantial development permit.
In answer to the third question, local government and the Department of Ecology may take informal or formal civil enforcement actions against a substantial development that is undertaken without a permit. Alternatively, conditional use permits may be used to manage this type of aquaculture if the approved shoreline master program includes such a requirement.
 BACKGROUND
Your questions concern a new type of shellfish farming that takes place on lower elevations of intertidal lands.[1] The process involves four-inch diameter PVC pipe cut into approximately one-foot lengths. The short PVC tube is inserted in the beach, leaving a few inches above the surface. A shellfish grower places tiny juvenile geoduck clams into the sandy substrate protected by the tube. The tube itself, or the general area, is covered with netting. Together, the tube and netting protect the juvenile geoduck from predators until it grows large enough to bury itself to a safer depth. After the geoduck has grown a sufficient amount to avoid predation (which requires several months), the shellfish grower removes the netting and tubes. The geoduck farming site may occupy many acres of tideland.
Approximately five years after planting, geoducks reach their marketable (and impressive) size as one of the world's largest burrowing clams. At that point, the shellfish grower harvests the clams which have "burrowed" two or three feet below the surface. A water jet loosens the substrate around the clam's shell and siphon (also called the "neck"), allowing the harvester to remove the geoduck from the muck.
The harvest incidentally releases silt and sediment which may temporarily be found in the surrounding water. Kent S. Short Raymond Walton, Ebasco Environmental, Transport and Fate of Suspended SedimentPlumes Associated with Commercial Geoduck Harvesting (April 1992) (copy on file). Removing a geoduck from the beach therefore results in a temporary depression where the substrate was loosened and the geoduck removed. See generally [original page 3] Washington Shell Fish, Inc., v.Pierce Cy., 132 Wn. App. 239, 131 P.3d 326 (2006) (petition for review denied Jan. 3, 2007) (discussing geoduck aquaculture).[2]
 1. May the Department of Fish and Wildlife require hydraulic projectapproval permits under RCW 77.55.021 to regulate planting, growing, andharvesting of farm-raised geoduck clams by private parties?
Your first question concerns the requirement for a hydraulic project approval (HPA) issued by the WDFW under the authority of RCW 77.55.021. That statute provides, in part:
 (1) Except as provided in RCW 77.55.031, 77.55.051, and 77.55.041, in the event that any person or government agency desires to undertake a hydraulic project, the person or government agency shall, before commencing work thereon, secure the approval of the department in the form of a permit as to the adequacy of the means proposed for the protection of fish life.
RCW 77.55.021(1) (emphasis added). A "hydraulic project" is "the construction or performance of work that will use, divert, obstruct, or change the natural flow or bed of any of the salt or freshwaters of the state." RCW 77.55.011(7). The work of inserting tubes and netting on the tidelands for geoduck aquaculture would be a hydraulic project because it is "work" that "uses" and "changes" the "bed of any of the salt or freshwaters of the state." Id. An HPA permit would thus be required for geoduck aquaculture unless there is some exception. The exception is in the statutes that address WDFW disease inspection powers for private sector cultured aquatic products.
RCW 77.115.010(2) provides, in part:
 The authorities granted the department by [the rules implementing a program of disease inspection and control for aquatic farmers] and by RCW 77.12.047(1)(g), 77.60.060, 77.60.080, 77.65.210, 77.115.020, 77.115.030, and 77.115.040 constitute the only authorities of the department to regulate private sector cultured aquatic products and aquatic farmers as defined in RCW 15.85.020.
(Emphasis added.)
[original page 4] Farm-raised geoducks are within the definition of private sector cultured aquatic products because they are "native, nonnative, or hybrids of marine or freshwater plants and animals that are propagated, farmed, or cultivated on aquatic farms". RCW 15.85.020(3). An "aquatic farmer" is a private sector person who "commercially farms and manages the cultivating of private sector cultured aquatic products on the person's own land or on land in which the person has a present right of possession." RCW 15.85.020(2). The case of State v. Hodgson, 60 Wn. App. 12, 802 P.2d 129 (1990), illustrates that privately planted geoducks can be private sector cultured aquatic products.[3]
RCW 77.115.010(2) allows WDFW to regulate private sector cultured aquatic products only by using the enumerated statutes, which do not include the HPA permit. We reach this conclusion after considering the two canons of statutory construction identified in your letter and by examining the language of the statute and the statutory scheme.
First, we examine whether the HPA statute is a later enacted statute that might apply to geoduck farming regardless of RCW 77.115.010(2). This concept does not apply, however, because the general HPA requirement dates back to the 1940s. See Laws of 1943, ch. 40, § 1. The HPA law, indeed, existed when the original version of RCW 77.115.010(2) was adopted in Laws of 1985, ch. 457, § 8. See former RCW 75.20.100 (1985 HPA statute). Thus, although a 2005 bill recodified the HPA law, we do not conclude that it is a new legal requirement. We therefore cannot conclude that HPA authority reflects a latter enactment outside the scope of RCW 77.115.010(2).
Second, we examine whether the HPA law is more specific than RCW 77.115.010(2), because a more specific statute is given effect if there is a conflict with a general statute. See Pannell v. Thompson,91 Wn.2d 591, 597, 589 P.2d 1235 (1979). However, the HPA law is substantially broader than RCW 77.115.010(2), applying to all work and construction in salt and fresh waters. In contrast, RCW 77.115.010(2) has a narrow scope. We therefore conclude that RCW 77.115.010(2) is a later enactment and more specific with regard to WDFW authority to regulate private sector cultured aquatic products.
Next, we consider that RCW 77.115.010(2) does not mention the HPA permit or terms that address HPA requirements. The HPA statute refers to "construction" or "work" that "uses" or "changes" the bed or flow of state waters. RCW 77.55.021(1). In contrast, RCW 77.115.010(2) does not use any of these terms. Moreover, other statutes in RCW 77.55 provide explicit exemptions to the HPA permit. See RCW 77.55.031-.071 (describing activities that might use or change the beds of state waters such as crossing an established ford, removing derelict fishing gear, abatement of certain noxious plants, hazardous waste cleanups, and construction of housing for sexually violent predators). It is arguable that these express [original page 5] exemptions in RCW 77.55 should be interpreted as providing the only exceptions to the HPA permit. See Inre S.B.R., 43 Wn. App. 622, 625, 719 P.2d 154 (1986) (express exceptions in a statute exclude all other exceptions).
However, we do "not construe statutes so as to render language meaningless." State v. Haddock, 141 Wn.2d 103, 112, 3 P.3d 733 (2000). RCW 77.115.010(2) has no meaning if it does not reflect a legislative intent to limit WDFW authority to regulate private sector cultured aquatic products. We therefore construe RCW 77.115.010(2) as a limit on WDFW regulation of private sector cultured geoducks using the following guidance.
First, RCW 77.115.010(2) acts as an exception and must be read narrowly. See State v. Turpin, 94 Wn.2d 820, 825, 620 P.2d 990 (1980) (statutory provisos should be strictly construed with doubts resolved in favor of the general provisions to which the proviso does not strictly apply). We also avoid absurd or unintended consequences. Frat. Order ofEagles, Tenino Aerie v. Grand Aerie, 148 Wn.2d 224, 239, 59 P.3d 655
(2002) (The courts "will avoid literal reading of a statute which would result in unlikely, absurd, or strained consequences."). Thus, we do not read RCW 77.115.010(2) disjunctively as a limit on WDFW regulation of any registered aquatic farmer, because that leads to absurd results where, for example, WDFW could not regulate an aquatic farmer who is hunting because the laws regulating hunting are not on the statutory list. We read RCW 77.115.010(2) conjunctively. Thus, it limits regulations when applied to both the private sector cultured aquatic products and the aquatic farmer.[4]
We also rely on RCW 77.12.047(3) to reach our conclusion. This statute provides that rules adopted by the Fish and Wildlife Commission shall not apply to private sector cultured aquatic products, except for rules adopted under RCW 77.12.047(1)(g) (allowing WDFW to adopt rules "specifying the statistical and biological reports required from fishers, dealers, boathouses, or processors of wildlife, fish or shellfish.") Under this statute, WDFW rules governing the time, place, and manner for taking wild fish, shellfish, and wildlife are not applicable to private sector cultured aquatic products. We conclude that if an HPA permit were used to regulate geoduck planting and harvesting, it would sidestep this express limit on the use of WDFW rules, confounding express legislative intent.
Finally, we consider that the HPA permit is enforced primarily using criminal sanctions under RCW 77.15.300. Interpretation of whether an HPA permit is required must therefore consider the rule of lenity. Under the rule of lenity, if two possible constructions of a statute imposing a criminal penalty are permissible, the criminal statute will be construed against the state and in favor of the accused. See, e.g., State v.Radan, 143 Wn.2d 323, 330, 21 P.3d 255 (2001). A person planting geoducks without an HPA permit would properly invoke the rule of lenity to argue for the above interpretation of RCW 77.115.010(2) limiting the HPA permit requirement.[5]
 [original page 6] 2. Should local governments require shorelinesubstantial development permits under RCW 90.58.140 for planting,growing, and harvesting farm-raised geoduck clams by privateparties?
 Background — The Shoreline Management Act
The Legislature enacted the Shoreline Management Act (SMA) to protect and to manage the private and public shorelines of Washington State; to further public health, public rights of navigation, land, vegetation, and wildlife; and to plan for and foster reasonable and appropriate shoreline uses. RCW 90.58.020; Samuel's Furniture, Inc. v. Ecology,147 Wn.2d 440, 448, 54 P.3d 1194 (2002). The SMA regulates both "uses" of shorelines as well as "developments" on them. Clam Shacks of Am., Inc.v. Skagit Cy., 109 Wn.2d 91, 95-96, 743 P.2d 265 (1987).
RCW 90.58.140(1) provides that development on the shorelines shall not be undertaken unless consistent with the SMA, with SMA guidelines, and with local government master programs. Subsection (2) prohibits substantial development on the shorelines "without first obtaining a permit from the government entity having administrative jurisdiction under this chapter."
RCW 90.58.030(3)(d) defines "development" to mean:
 a use consisting of the construction or exterior alteration of structures; dredging; drilling; dumping; filling; removal of any sand, gravel, or minerals; bulkheading; driving of piling; placing of obstructions; or any project of a permanent or temporary nature which interferes with the normal public use of the surface of the waters overlying lands subject to this chapter at any state of water level[.]
RCW 90.58.030(3)(e) defines "substantial development" as "any development of which the total cost or fair market value exceeds five thousand dollars, or any development which materially interferes with the normal public use of the water or shorelines of the state." We accept your suggestion that we engage in the reasonable assumption that the cost and value of such activity will exceed the five thousand dollar threshold for "substantial" development in RCW 90.58.030(3)(e).
"Under the [SMA] no `substantial development' exists if there is no `development' within the meaning of RCW 90.58.030(3)(d), because for there to be a `substantial [original page 7] development', there must first be a `development'". Cowiche Canyon Conservancy v. Bosley,118 Wn.2d 801, 812, 828 P.2d 549 (1992). Our analysis therefore focuses on whether geoduck farming is a development.[6]
Substantial development permits are administered by local government according to shoreline master programs. RCW 90.58.140(3). The process for development of the shoreline master program governing these permits is described in Weyerhaeuser Co. v. King Cy., 91 Wn.2d 721, 729,592 P.2d 1108 (1979):
 The SMA requires each local government to develop a master program for the use and development of shorelines within its boundaries. RCW 90.58.080. The programs, once approved by the Department of Ecology, operate as controlling use regulations for the various shorelines of the state. RCW 90.58.100.
Analysis
We start by examining a recent case where the Court of Appeals held that a geoduck tube aquaculture operation required a substantial development permit. Wash. Shell Fish, 132 Wn. App. 239.[7] The Court analyzed the Pierce County shoreline master program definitions for substantial development, which are identical to SMA definitions. It held that geoduck aquaculture in that case involved "development" because it interfered with normal public use of the waters. Id. at 251-52, citing RCW 90.58.030(3)(d) ("any project of a permanent or temporary nature which interferes with the normal public use of the surface of the waters overlying lands subject to this chapter at any state of water level").
We have found the Court of Appeals opinion answers your question only in the context of the facts of that case, and it fails to offer an analysis applicable to all geoduck tube aquaculture. To answer your questions, we conclude that geoduck tube aquaculture does not necessarily fall within the definition of development except where it interferes with normal public use of surface waters, as inWashington Shell Fish:
 Several witnesses testified that WSF left rope in the water where WSF had planted geoducks, and this rope would become entangled with people or non-geoduck-harvest-related objects. WSF divers harvesting geoducks placed markers on the water's surface that prevented public use of that area. The PVC planting pipes that WSF inserted into the shorelines were up to 12 inches long, [original page 8] with their top portions protruding vertically out of the sand. In addition, according to one witness, WSF used up to four boats at a time to store the geoducks that divers harvested, one of which was a barge large enough to drag a buoy; these WSF boats further constricted the water surface open to public use.
Wash. Shell Fish, 132 Wash. App. at 251. The opinion goes on to describe the particular site where wind surfers were affected by the project. The relevant factors appear to be the public use of the surface waters of the site and the manner in which the geoduck project interfered with public use — floating ropes on the surface, markers on the water's surface creating barriers to public use, and barges and boats that occupy the site to the exclusion of the public.
Although Washington Shell Fish shows how geoduck tube aquaculture can interfere with use of surface waters, nothing in the description of geoduck aquaculture necessitates such interference. The PVC pipes protrude only inches and have no more interference with use of the surface waters than bags of oysters, clam nets, or a small rock on the shoreline. The markers, floats, barges, and entanglements affecting the surface in Washington Shell Fish may not exist at every geoduck farm. The neighboring public park appears to trigger the interference with public use of the surface waters.
Therefore, although hypothetically a project may interfere with use of surface waters, we conclude that the SMA addresses permitting of actual "projects" and involves a concrete examination of whether the project interferes with normal public use of surface waters. The WashingtonShell Fish case illustrates this approach by examining the facts of a particular project. Accordingly, we conclude that whether a particular geoduck farm interferes with normal public use of surface waters will depend on the facts, which should be determined by local government when deciding if a permit is required. See RCW 90.58.140(1).
We next examine the other statutory definitions of development. TheWashington Shell Fish opinion does not address the argument that geoduck tube aquaculture is development because the harvest disrupts the substrate around the geoduck. Wash. Shell Fish, 132 Wash. App. at 252
n. 12. We conclude that disruption of the substrate around a geoduck, considered in isolation, cannot be legally distinguished from general clam digging or raking. Any clam harvest disrupts the substrate around the buried clam. We find no indication that the SMA has ever treated clam harvesting, alone, as development. Moreover, it would lead to a burdensome and apparently unintended consequence where substantial development permits would be required for all significant clam beds, both commercial and recreational.
Next, we consider whether geoduck tube aquaculture involves dredging. In 1977, the Washington Supreme Court affirmed the Shoreline Hearings Board and held that clam harvesting using a dredge was a type of substantial development. English Bay Enters., Ltd. v. Island Cy.,89 Wn.2d 16, 568 P.2d 783 (1977). The court rejected the harvester's argument that the statutory definition of "development" did not explicitly include clam harvesting.
 [T]he Board found, and we find here, that it is not the goal of the appellant's activity which governs but rather it is the method employed. The appellant's operation involves the removal of earth from the bottom of the bay. In the plain and ordinary sense of the term, this procedure is "dredging." The Board found [original page 9] that this activity constitutes dredging; the interpretation of the Board is to be given great weight. Hama Hama Co. v. Shorelines Hearings Bd., 85 Wash.2d 441, 536 P.2d 157 (1975).
Id. at 20 (emphasis added).
The dredging in English Bay is significantly different. A hydraulic dredge machine removed the top twelve inches of beach, leaving a trench while dislodging clams. Id. at 18. The English Bay case thus involved a dredging machine, which is necessary to dictionary definitions of dredging, but absent in geoduck farming. See Merriam-Webster OnLine Dictionary, Dredging, "1 a: to dig, gather, or pull out with or as if with a dredge — often used with up b: to deepen (as a waterway) with a dredging machine". The water jet used to loosen the substrate around an individual geoduck is not a dredging machine, even if water jets might be used for dredging channels in other places. Here, the water jet simply loosens a geoduck.
Constructing Structures
Geoduck tubes do not fall within the ordinary meaning of the word "structures" referred to in the definition of development. WAC173-27-030(15) defines structure as "a permanent or temporary edifice or building, or any piece of work artificially built or composed of parts joined together in some definite manner." This does not suggest that a structure could comprise of PVC tubes on a beach. The tubes are not "edifices or buildings" taken separately, they do not form an "edifice or building" taken together, nor are the tubes "parts joined together in a definite manner." Our conclusion is reinforced by Cowiche CanyonConservancy, above, where the Court rejected an argument that removal of railroad trestles was a development, because it modified a structure. The Court there held that removal resulted in no structures, applying the common meaning of the term.
Drilling, Filling, And Removal Of Materials
The term "drilling" is commonly defined in terms of creating a hole.See Merriam-Webster OnLine Dictionary, Drill, "2 a (1): to bore or drive a hole in (2): to make by piercing action drill a hole". While tubes could be creatively described as being "drilled into" the substrate, no hole is created. The tube is a temporary barrier protecting the juvenile clam.
Similarly, while sand, silt, and gravel is disturbed, geoduck aquaculture does not involve filling of tidelands. In contrast,Dep't of Fisheries v. Mason Cy., SHB No. 88-26, 1989 WL 106061 (Wash. Shore. Hrgs. Bd. Aug. 15, 1989), the Shoreline Hearings Board considered a proposal to apply several inches of gravel over large areas of tidelands to create an artificial bed for clam production. That filling required a substantial development permit.
Finally, if sediment is disrupted during harvest, only a minimal amount of sediment is actually removed with the clam. This minimal amount of materials removed does not comport with a reasonable interpretation of the statutory language concerning "removal of materials." See Black's Law Dictionary 464 (8th ed. 2004), "de minimisnon curat lex" (the law does not concern itself with trifles).
[original page 10] Placing Obstructions
The statutory definition refers to "placing obstructions" as "development." Assuming that this refers to blocking or clogging passage on the water, we conclude that it is conceivable that a project might involve tubes, nets, or other materials that obstruct passage. Arguably, the tubes could obstruct a walker, but that would be relevant only if placed on tidelands used by the public. This term should be applied based on the particular project, as in Washington Shell Fish. Local government, as the primary administrator of the substantial development permit system, would determine whether a particular project involves placing obstructions. See RCW 90.58.140(3); Samuel's Furniture,147 Wn.2d at 455.[8]
 The Farming Practices Exception
Several comment letters have raised the farming practices exception from the substantial development permit in RCW 90.58.030(3)(e)(iv). This subsection exempts:
 Construction and practices normal or necessary for farming, irrigation, and ranching activities, including agricultural service roads and utilities on shorelands, and the construction and maintenance of irrigation structures including but not limited to head gates, pumping facilities, and irrigation channels.
Every term in the exception describes upland farming; no term reflects aquaculture. See also WAC 173-27-040(2)(e) (adopting statute into regulation without any clarification or interpretation of aquaculture practices). Moreover, the Department of Ecology guidelines on shoreline uses distinguish between aquaculture and agriculture. See WAC173-26-241(3)(a), (b). We found no history to suggest that RCW 90.58.030(3)(e)(iv) was adopted to address aquaculture activities or that it has been applied to aquaculture.[9] Accordingly, we conclude that this exception does not apply to geoduck tube aquaculture.
To summarize, we conclude that geoduck aquaculture requires a substantial development permit if conducted as described byWashington Shell Fish. We do not conclude that geoduck [original page11] aquaculture inherently involves interference with normal public use of the surface waters in all locations. We also conclude that it does not involve dredging, construction, or other types of development described by RCW 90.58.030(3)(d). Therefore, the substantial development permit requirement is not necessarily required for intertidal geoduck farming.
As described in the next section, our conclusion does not imply that the SMA lacks authority for local government to manage geoduck aquaculture use of the shoreline. The SMA authorizes conditional use permits to manage shoreline uses.
3. If substantial development permits can be required for geoduckfarming operations, how can local government and the Department ofEcology address existing operations?
If there is a geoduck farm that meets the definition of substantial development, then both state and local government have a variety of options. First, government may simply pursue informal measures, like asking the geoduck farmer to obtain a permit. Second, RCW 90.58.210
authorizes Ecology and local government to issue penalties, orders requiring permits, and orders requiring corrective action.[10]
We also note that government may consider using "conditional use permits" to regulate geoduck aquaculture. The Clam Shacks case, cited above, illustrates this SMA regulatory power. In that case, a shellfish harvester using a "hydraulic rake" claimed that if his harvests did not involve substantial development, then no SMA permit could be required to regulate it as a use of the shoreline. The Washington Supreme Court unanimously rejected the argument. The SMA includes express directions and powers to regulate and manage "uses" of the shoreline. Local government may, therefore, require a conditional use permit to manage that hydraulic rake clam harvest. The opinion contains the following discussion:
 Clam Shacks argues that the language of the statute and its application of the permit process only to substantial developments limits the SMA to developments as defined. Thus, Clam Shacks concludes there can be no use control, regardless of the master program, unless the activity involved constitutes a development. We disagree. Such construction would frustrate the declared policy of the SMA.
Clam Shacks v. Skagit Cy., 109 Wn.2d at 95.
It is likely that shoreline master programs have not considered using conditional use permits to regulate geoduck aquaculture and, therefore, that option is not immediately applicable in all jurisdictions. However, all local master programs are being reviewed and updated during the upcoming decade. See RCW 90.58.080. Ecology's guidelines for updating master programs [original page 12] provide that aquaculture of this type is a favored use of the shoreline environment that should be accommodated by shoreline master programs. WAC 173-26-241(3)(b).[11]
Therefore, this option is prospectively available as a means for managing existing and future operations.
We trust that the foregoing analysis will be helpful to you.
Sincerely,
 ROB MCKENNA Attorney General
 JAY DOUGLAS GECK Deputy Solicitor General
:pmd
[1] Intertidal here simply refers to tidelands that are periodically covered and uncovered by the daily high and low tides. It is not necessary to distinguish types of tidelands and bedlands to address the questions.
[2] Embedded and immobile shellfish are part of the real property, under Washington law, belonging to the landowner. State v.Longshore, 141 Wn.2d 414, 5 P.3d 1256 (2000). The proprietary aspect of shellfish is illustrated by statutes such as RCW 79.135.130, which requires payment of fair market value for existing shellfish on state aquatic lands before leasing to a shellfish farmer. Other state laws allow shellfish to be taken without regard to the state's proprietary interest. For example, shellfish on certain parks and public lands are available for recreational harvest under licenses and rules of the WDFW and other state agencies.
Shellfish may also be subject to a "right of taking fish at all usual and accustomed grounds and stations" created by federal treaties with various Indian Tribes in Washington. Because federal law creates the treaties and preempts contrary state laws, the right of taking shellfish under the treaty can be applied notwithstanding state property law.See United States v. State of Washington, 157 F.3d 630, 646-47 (9th Cir. 1998).
[3] In Hodgson, a criminal defendant contended that geoduck clams he harvested from DNR-managed bedlands were private sector cultured aquatic products. The court took judicial notice that geoduck clams take five years to mature and rejected the defendant's argument because the harvester's connection with the public geoduck beds was transitory, and wild geoduck clams were not under the active supervision and management of a private aquatic farmer at the time of planting. State v.Hodgson, 60 Wn. App. at 17-18. In contrast to Hodgson, your question deals with an aquatic farmer who actively supervises and manages the geoduck clam bed at the time of planting.
[4] Thus, a person who constructs a boat ramp, dock, or other construction work at an aquatic farm would require an HPA permit, because the permit regulates construction; it does not regulate aquaculture products.
[5] Whether lenity applies here depends on whether application of HPA laws to a geoduck planter would be criminal. An ordinance is penal or criminal in nature when "a violation of its provisions can be punished by imprisonment and/or a fine." State v. Von Thiele, 47 Wn. App. 558,562, 736 P.2d 297 (1987). An ordinance is remedial, rather than criminal, "when it provides for the remission of penalties and affords a remedy for the enforcement of rights and redress of injuries." VonThiele, 47 Wn. App. at 562. Civil and criminal penalties may coexist without "converting the civil penalty scheme into a criminal or penal proceeding." Von Thiele, 47 Wn. App. at 561.
We interpret the HPA laws using lenity because of the primacy of the criminal sanctions; the HPA code includes minimal civil remedial powers. For example, the HPA laws include no provisions for civil orders to stop work or to take corrective actions. See RCW 90.58.210(3) (Shoreline Management Act authorizes civil penalty, stop work orders, and corrective action orders). While the HPA laws include a narrow civil penalty provision, RCW 77.55.291, the requirement of an HPA is enforced with a criminal sanction under case law. State v. Crown ZellerbachCorp., 92 Wn.2d 894, 602 P.2d 1172 (1979).
[6] In addition to substantial development permits, the SMA contemplates conditional use permits and variance permits. These latter types of permits are issued by local government but require the approval of the Department of Ecology to be valid. RCW 90.58.140(10);Samuel's Furniture, 147 Wn.2d at 455, n. 13. We discuss the option of using conditional use permitting in response to the third question.
[7] The Washington Shell Fish case arose after the county leased 47 acres of county park tidelands for a nominal fee and the lessee proceeded to remove approximately 2.7 million dollars worth of geoducks.Wash. Shell Fish, 132 Wash. App. at 253. The county then raised the issue of a substantial development permit and also challenged the validity of its lease. See Pierce Cy. v. Wash. Shell Fish, Inc., No. 31380-4-II, 2005 WL 536097 (Wash.Ct.App. Mar. 8, 2005) (unpublished).
[8] Washington common law also shows that the private property interest in a shellfish farm allows the farmer to restrain the general public from interfering with the farm. See Sequim Bay Canning Co. v.Bugge, 49 Wash. 127, 94 P. 922 (1908) (lessee of state aquatic lands devoted to shellfish operation can bring trespass action against others who enter the lands and take clams). Thus, even if the PVC tubes might hypothetically affect a person crossing a shellfish farm, it is not a cognizable obstruction of the public, because the person is there at the farmer's express or implied permission.
[9] We note that the findings section of the Aquaculture Marketing Act, RCW 15.85.010, describes a general goal that aquaculture "should be considered" a branch of the agricultural industry for purposes of laws that advance and promote the agricultural industry. "When the legislature employs the words `the legislature finds,' as it did in RCW 80.36.510, it sets forth policy statements that do not give rise to enforceable rights and duties. See Aripa v. Dep't of Soc. HealthServs., 91 Wash.2d 135, 139, 588 P.2d 185 (1978)." Judd v. Am. Tel. Tel. Co., 152 Wn.2d 195, 203, 95 P.3d 337 (2004). The Aquaculture Marketing Act, therefore, does not amend RCW 90.58.030(3)(e)(iv) to change the intent to address farming as described by the words in that subsection. We conclude that for marketing purposes, the Legislature intended to include aquaculture with agriculture but did not intend to erase all distinctions for purposes of environmental regulation or other laws not related to marketing.
[10] We interpret your third question as addressing unpermitted projects where no local decision expressly determined that no substantial development permit is required. If local government previously decided that a project is not a substantial development and did so with a final written local decision, then that decision may be final and unappealable because of appeal deadlines in the Land Use Petition Act. See Samuel's Furniture, 147 Wn.2d at 463 (local government decision that project was not in the shoreline became a final decision that no SMA permit is required because it was not appealed under the Land Use Petition Act, RCW 36.70C).
[11] Local government regulation of aquaculture in the shoreline must be consistent with the policies of the SMA, which promote appropriate aquaculture uses. See AGO 1988 No. 24 (opining that local government regulation of aquaculture in the shoreline must be done consistent with the SMA). As explained in this 1988 Attorney General's Opinion, the Planning Enabling Act, RCW 36.70, and local police powers cannot be used to impose greater restrictions on aquaculture than allowed under the shoreline master program.